**BETHLEHEM STEEL CORPORATION**

**v.**

**UNITED STATES.**

**No. 44–68.**

United States Court of Claims.
March 20, 1970.

Albert R. Connelly, New York City, for plaintiff, James C. Hansen, New York City, of counsel.

James F. Merow, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge.

This is an action to recover amounts claimed to be due the plaintiff under labor and material escalation clauses in Contracts Nobs–3556 and Nobs–3648, under which plaintiff built five destroyers for the United States Navy at the shipyard it then owned at Quincy, Massachusetts. The contracting officer denied all escalation but in disputes clause appeals the Armed Services Board of Contract Appeals (ASBCA) allowed upward adjustments under the two contracts in the amounts of $1,064,151 and $876,028, respectively, which it computed as an allowance of 5% profit on costs after restoring certain cost disallowances the contracting officer had made, not here in issue. This being less than plaintiff's claims, it seeks review here under Wunderlich Act standards, 41 U.S.C. §§ 321 and 322. The parties have filed cross motions for summary judgment. We deny both motions and suspend further proceedings in this court to enable the parties to apply to the ASBCA for further findings of fact, pursuant to the opinion that follows.

The contracts were awarded by negotiation and included standard provisions requiring the contractor to exclude from its cost estimates all contingency allowances for increases in labor and material costs from the levels then obtaining, but on the other hand, allowing price increases according to an agreed formula reflecting labor and material cost increases experienced in the contract period by shipbuilders agreed upon as representative. There is no dispute that such cost increases did occur, nor as to the contract price increases that would result, except for Article 6(e), which reads as follows:

(e) The Contracting Officer may deny, in whole or in part, any upward adjustment in the contract price required under this Article if the Con-

tracting Officer finds that such adjustment is not required, in whole or in part, to enable the Contractor to earn a fair and reasonable profit under this contract.

This contract language came before us for interpretation three years ago in *Newport News Shipbuilding & Dry Dock Co. v. United States,* 179 Ct.Cl. 97, 374 F.2d 516 (1967). The nub of the controversy here is how to apply the rulings then made to the somewhat different facts and regulation before us now. These facts are stipulated, so far as they go, the Board having taken no testimony. The refusal of any escalation clause increases by the contracting officer, and the refusal of portions of the amounts otherwise accrued, by the ASBCA, resulted from their beliefs that the amounts they denied were not required to enable plaintiff to earn fair and reasonable profits under the contracts. Both decisions were, however, rendered before ours in *Newport News.* Plaintiff would remand for further Board proceedings in light of *Newport News,* but defendant says *Newport News* is not applicable and the Board decision is entitled to finality.

The Navy decided to build three destroyers (DD 936–938) in a private yard. On or before January 25, 1954, it received proposals for major east coast concerns as follows, per ship:

Bath Iron Works .......... $15,492,000
Newport News ............ 16,800,000
Quincy (plaintiff) ........ 18,674,000
New York Ship ........... 19,234,000

As usual in negotiated procurement, all submitted cost estimates which showed that they anticipated profits of 9.3% of cost, in the case of one, to 9.4% for another, and 10% in the cases of Quincy and the fourth. Defendant, however, desired to award the vessels to Quincy because Quincy was about to run out of work and if it did, management would probably close down the yard, which was one of the largest and best equipped in the world. Moreover, plaintiff main-

tained at Quincy the design and engineering staff for all its several other shipbuilding and repair yards on both coasts. The anticipated closure, therefore, would have effected a material reduction in the capacity of the shipbuilding industry to produce for national defense in case of any emergency. Since World War II, the Navy had on one or more occasions bailed all of the above named companies out of potentially disastrous slumps in their business by awarding them shipbuilding contracts when they were not the lowest bidders. They were painfully dependent on the Navy, for all other customers together accounted for but 35% of their business, yet even the Navy's orders were at a modest level pending the wearing out or obsoletion of the vast tonnages delivered in World War II. All four yards were, therefore, operating at a minor fraction of capacity. The three other than Quincy, did have enough orders to keep them busy at the then level of activity for a year or two to come, so it was only Quincy that was in immediate danger of shutdown. The Navy, accordingly, decided to negotiate with Quincy.

To avoid making a bad situation worse, the Navy asked plaintiff to reduce its bid and it took $1,000,000 off the price of each ship, and the award was made at $17,674,000 per unit, which was still considerably over the bids of Bath Iron Works and Newport News. The revised cost estimates remained unchanged, but showed that plaintiff was now estimating a profit of $698,000 instead of $1,698,000. There was, however, no contract provision that plaintiff's profit would be any particular figure.

One asks next why plaintiff estimated its costs so much above competitors who were, by its account, no more efficient, and had no better plant. The answer is that the three destroyers would have utilized only 5% of Quincy's capacity. In estimating its costs, Quincy calculated it would have no other business and the contract for the destroyers would have had to carry the overhead of that vast establishment. Evidently the Navy had

to contribute towards this overhead if it was to persuade plaintiff not to close the plant down. Bath, being smaller and busier, was far more favorably situated with respect to overhead. We conclude that in the events that matrialized, that is, Quincy's receiving other orders, the allocable overhead would have been less, and therefore the costs.

The circumstances of this award are given because, as will appear, they afford the basis for defendant's argument that *Newport News* is not applicable as a precedent. The facts stated above were either found by the Board, or else appear as testified in the printed transcript of a hearing conducted by a subcommittee of the House Armed Services Committee in February and March, 1954, to inquire into the award of Nobs–3556 and the rejection of the low bids. The parties here attached it to their stipulation as Exhibit 6, without restriction as to relevance or use, so we use it as uncontradicted evidence.

The other contract in this litigation, Nobs–3648, was awarded plaintiff later the same year and called for construction of two additional destroyers, DD 943 and 944, at a negotiated price of $16,-250,000 per ship, including an estimated profit of $698,000. There was, therefore, a cost saving estimated. It had the same limited escalation as Nobs–3556. There were other awards not involved in this litigation while the five destroyers were under construction, notably a nuclear powered cruiser and three guided missile frigates. Plaintiff delivered the first destroyer on November 30, 1956, three more in 1957, and the last on February 26, 1958. There were, as usual, change orders and equitable adjustments therefor, not now in dispute. The costs, except for those extras and escalatable labor and material, were lower than estimated, plaintiff says due to cost savings all along the line.

The financial results under the two contracts are set forth in detail in the Board findings and need not be repeated here at this time, especially since the case may come before us again. To pose the

legal problem it suffices to say that labor and material escalation, before any Article 6(e)· exclusion, totalled $3,347,500 and $2,404,900 under the two contracts, respectively. The profit before any escalation, but reflecting the Board's decision as to allowable costs, would be $1,597,000 under Nobs–3556 and $775,000 under Nobs–3648, making 3% and 2.3% of cost respectively. The profit with partial escalation allowed by the Board as stated above would be 5% of cost under both contracts. The profit with full escalation would be $4,990,000 under Nobs–3556 and $3,180,000 under Nobs–3648, being 9.3% and 9.6% of cost respectively. That the profit with full escalation is so much over the contract estimate is due, as said above, to savings in non-escalatable costs, but the Board did not perform any analysis to determine how these savings were accomplished. The Board also considered profits as a percentage of price, but we need not go into that here.

Our *Newport News* decision interprets the Article 6(e) language together with a Department of Defense regulation in effect when the administrative decision was made, 22 F.R. 5927, 32 C.F.R. §§ 3.808 and ff. The former we viewed as requiring an administrative determination as to what a fair and reasonable profit would be under the contract incorporating the clause in light of the performance history and financial results. Such a determination would be a finding of fact, final in this court if supported by substantial evidence and made in accordance with law. The latter, the regulation, we found to contain language telling how such a determination was to be made, whether related to initial pricing or any sort of contract repricing. There was nothing to show that in making the findings there involved, the Board had employed or intended to employ the technique the regulation prescribed, and several statements in the Board opinion afforded indications that the regulation was not deemed applicable. We suspend further action to allow the parties to apply for further Board findings, without

intimating any opinion, or indeed, having one, whether the level of fair and reasonable profits as the Board had determined was adequate or not.

That case has stood on the books for three years now without any sort of challenge on defendant's part, not even a motion for reconsideration. Since our holdings deviated to some extent from those urged upon us by either party, they may well have come as somewhat of a surprise, and a motion for rehearing on the ground of surprise would not have lacked dignity. As things are, this is the first chance we have had to learn defendant's views. Defendant apparently agrees with us to a large extent, and appears in general willing for *Newport News* to be followed in cases that reproduce its facts. That carries important implication.

■■ The contracts here, as in *Newport News*, were made before the Pentagon had on the books any regulation prescribing, except in redeterminations, any technique of determining a level of reasonable profits for a defense contractor. The involved regulations, however, when made, appeared to be remedial, meant to safeguard defense contractors against determinations as to a reasonable profit level, arbitrary, perhaps biased, or founded on "seat-of-the-pants intuition", which contracting officers might make without proper guidelines. There is no reason to postulate an intent to withhold such safeguards from parties to then existing contracts, nothing to that effect appearing either in the contracts or the regulation. Defendant refers, properly we think, to Thorpe v. Housing Authority, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), as being in agreement with our position. Since Government officials are presumed to act properly, it is reasonable to suppose that the Pentagon would not have promulgated clauses such as Article 6(e) unless contracting officers could employ established techniques and guidelines, even if unpublished, and therefore would not act arbitrarily. If any contractor supposed he had rights vested under a contract which were substantially subverted by a regulation later adopted as to how to determine reasonable levels of profits, he might come into court and show it. See Thorpe, *supra*, at p. 283, 89 S.Ct. 518. In the absence of such a showing we cannot assume it would occur.

■ Defendant passes over in silence the fact noticed by the dissenting judges in *Newport News*, that plaintiff there had done nothing to alert the Board to the fact it was not following the Department of Defense's regulations. That is equally true of the instant case. It is indeed, generally, a salutary rule that a party cannot assign an error here that he has not given the administrative tribunal a chance to correct. But the points plaintiff did make below were of a nature that should have alerted the Board to test what it was doing against applicable regulations. We think an exception in such a case must be made in the interests of fairness when the error consists of a mutual ignoring of a whole body of applicable agency regulations. Agency officials have considerable practical power to steer the choice of issues to ground of their selection, in proceedings before their agencies. If attention is totally diverted from applicable regulations the responsibility for this error is not equal. Agency officials have the means and the duty to be aware of their own regulations to a greater extent than outsiders. It is not fair to throw the consequences of such a mutual mistake wholly on the party least responsible for causing it. We say this not meaning to impugn the good faith of the Pentagon officials, who apparently quite sincerely believed that a clause such as Article 6(e) was somehow something other than the kind of pricing and repricing power the guidelines were meant to cover. The arguments made to us by both sides in *Newport News* reflected a state of great confusion on both sides as to what Article 6(e) was meant to do. The requirement for exhaustion of administrative remedies is not inflexible in some exceptional circumstances. *E. g.*, Mallow v. United States, 161 Ct.Cl. 207, 212 (1963).

This brings us at length to the difference which defendant says exists between this case and *Newport News*. It is not that the regulations involved are new, though they are, as set forth below. Defendant says that this case falls clean outside all published guidelines for determination of a reasonable level of profit, because the contracts were awarded to other than the low bidder for the purpose of continuing the existence of an essential defense facility. This position does not require defendant to take issue with our holding in *Newport News* and it does not, yet it likewise does not require defendant to argue, as indeed it could not, that the Board here paid any attention to guidelines or techniques for determining a reasonable profit level, as published by the Department of Defense or anyone else, and in effect at the time the Board decided. No such publication is ever alluded to in the Board decision. It does indeed use guidelines, but they are "do-it-yourself" guidelines constructed by the Board itself out of arguments and suggestions of counsel. As already pointed out, counsel on neither side suggested to the Board that it should follow the published guidelines, and that is the obvious reason why it did not do so.

A Department of Defense regulation that was in effect at the time of the instant Board decision, and also that of the contracting officer, was published in 1963, 28 F.R. 12546, 12555, amending 32 C.F.R. Part 3, §§ 3.808 and ff. It supersedes the one we construed in *Newport News*. It states and describes, with copious illustrations, the "Weighted guidelines method" of determining reasonable levels of contractor profits. Defendant does not now deny that it would govern most decisions limiting or refusing otherwise justified labor and material escalation under Article 6(e), and there is nothing in it that suggests an intent to narrow the former scope. But, defendant says, this case is an exception. However, the regulation itself in § 3.808–2(b), enumerates the recognized exceptions to it, and the situation here involved is not on the list. Any other exception must be authorized by the head of the procuring agency, and no such authorization is asserted here. On the other hand, the statute defendant says authorized this type of procurement to keep a contractor in business, The Armed Services Procurement Act of 1947 § 2(c) (16), now revised and codified as 10 U.S.C. § 2304(a) (16) (1964), does not speak in terms of any exemption from profit guidelines ordinarily applicable.

If defendant's postulated exemption exists, it must be a large one. The record shows that all of plaintiff's above named competitors in the shipbuilding industry were awarded major contracts at one time or another between World War II and 1954, when they were not the low bidders, for reasons the same as those which animated the award of Nobs–3556 to plaintiff. The situation recurs so commonly in our litigation with other industries heavily dependent on defense work, that we may take judicial notice of it: a rigid adherence to procurement from the lowest bidder only is viewed in the Pentagon as gradually freezing out the competition and leading into single-source procurement. The subcommittee recognized the validity of this view in its hearing on the instant award, as did the whole Congress, of course, in enacting 10 U.S.C. § 2304(a) (16). It would be strange if so large an exception to the use of the "Weighted guidelines method" went unmentioned in the enumeration of exceptions in the regulation itself. The new regulation requires use of the guidelines if cost analysis is required. § 3.808–1(b). Cost analysis is required with respect to negotiated fixed price contracts with escalation, all of which these are. § 3.807–3(a) (2). To put it succinctly, the alleged exception has every earmark of having originated in the active mind of defense counsel herein, not in the perhaps more rigid thinking of the Pentagon.

Defendant says that plaintiff agreed to accept a profit of around 5% in consideration of being awarded the contract, though not the low bidder, and therefore use of the "Weighted guidelines method"

to produce a higher profit would be so unfair that an exception to the method must be implied. The contracts, however, reflect that plaintiff agreed only upon a price. The alleged agreement upon a profit came in the revised cost estimates, which showed estimated costs only $698,000 per unit below the agreed price. Both parties must have been aware that this estimated cost was a figure plucked from the atmosphere. Mr. Strohmeier, plaintiff's vice president, testified at the Congressional hearing, without contradiction, that the entire excess of his company's cost estimates over Bath's was due to the higher allocation of overhead, and this difference, in turn, resulted from the hypothesis, that the Quincy yard would be operating at but 5% of capacity, having no other work than the three destroyers. Even so, on that hypothesis, the estimated allocation he thought was insufficient. If his company built the three destroyers and had no other construction at the Quincy yard, he expected it to suffer a loss. On the other hand, if it received enough other business so it could operate at a "normal" level, its contract costs would fall to approximately Bath's estimates. In that event, which was surely always possible, and wholly apart from any savings due to efficient manufacture, there would have been a large windfall profit under Nobs–3556, for whose recapture the contract made no provision if one disregards the statutory renegotiation article. Defendant does not and could not regard that article as contributing in any way to its argument that plaintiff agreed to a profit level of exactly 5%. The alleged agreement to a 5% level, in a contract that viewed prospectively could have resulted in anything from a loss to a windfall profit level, according to its terms, must be regarded as located in defendant's counsel's eyes alone.

As already noted, plaintiff in preparing its cost estimates was required to assume there would be no increases in labor and material costs, and in analyzing the possibilities of profit in the contract, we have up to this point done so likewise.

In the more probable event there were such increases, the escalation clause became operative and in general its effect would be, absent Article 6(e), to stabilize the profit or loss at a fixed dollar (not percentage) figure against any degree of labor and material cost inflation. There might be some small profit or loss resulting from the escalation clause itself, as the plaintiff's own experienced labor and material costs might be more or less than the general industry experience used to fix the escalation indices. There was nothing in the escalation clause before Article 6(e), agreeing to a 5% profit. In Article 6(e) there was certainly a possibility that the profit would be cut, but 5% is not mentioned.

We have now examined every pertinent part of the contract and nowhere find agreement to a 5% profit level, while we do find provisions that enable a profit much exceeding 5%, whether or not escalation was required, depending on conditions which were perfectly foreseeable and which plaintiff would certainly exert itself to bring about, i. e., a normal utilization of the yard. On the other hand, the $698,000 profit estimate contemplated a state of inadequate utilization which could hardly have been expected or allowed to be other than temporary.

While we say plaintiff did not agree to 5%, we do consider that a high bidder given a contract award purely to keep him in business, might expect this fact to be considered as unfavorable to him under any rational system of profit limitation. Defendant's view that the "Weighted guidelines method" would fail to give weight to this apparently is basic to its argument that the method is so unsuited to the instant procurement that the exception of it from the regulation must be implied. We do not read the regulation that way. The plaintiff's overhead allocated to Contract Nobs–3556, was by the evidence in the record entirely out of line with that which the lower bidders would have allocated. A Board applying the method would be required by § 3.808–5(b) (3) to analyse the

overhead items of cost and determine "how much they contribute to contract performance." A range of 4–7% is assigned to "manufacturing overhead" and a range of 6–8% to general and administrative expenses. We think the Board would be within its charter in denying a return on that part of the overhead which exceeded the allocation of other shipbuilders. Moreover, under § 3.808–5(e)(1) the Board is to make an analysis "of the contractor's dependence on Government financial assistance * * *." If the dependence is great, it is a minus factor in determining the allowable profit. While the point may be debatable, we think that the addition of a bonus to a contract price to enable the contractor to maintain uneconomically large facilities in being is in reality a form of Government financial assistance and should be treated as such.

On the other hand, the guidelines attach favorable consideration in § 3.808–5 (c) to "Contractor's assumption of contract cost risk." The guidelines here look with least favor on a cost plus fixed fee contract with full cost reimbursement, and most favorably, at the other end of the scale, on a "closely priced firm fixed price contract" for a complex item, which "would reflect a complete assumption of cost responsibility." We have here a firm fixed price contract for a complex item, with only limited escalation, and according to Mr. Strohmeier, a real possibility of loss prospectively considered, if other business was not obtained. It would appear Contract Nobs–3556 at least is, on this factor, closer to the favorable than the unfavorable end of the scale. (Of course we do not know from the record to what extent the loss would have been an actual cash drain and to what extent a paper write-off.) The guidelines appear to be the Pentagon's best thinking on the subject of the proper administration of profit limitation clauses, and this favorable consideration of close pricing and assumption of risk stands in stark contrast to the Board's unfavorable consideration of what is apparently the same thing:

plaintiff's willingness to accept a price shaved close above the estimated cost.

It would, of course, be improper for us to make a determination ourselves under the "Weighted guidelines method" for the reasons explained in *Newport News* and for the further reason that the record is inadequate. To use the method one needs to be well informed. The Board will no doubt supplement the stipulation with further evidence. We do not know whether, by proper application of the method, plaintiff will fare better or worse than 5%. Plaintiff desires to take its chances under the "Weighted guidelines method" and it has a legal right to do so.

As we have said, we see no injustice or anomaly in applying profit limitation techniques, as the Pentagon may have amended and prescribed them from time to time, up to the date of the determination. We would presume that changes were intended to clarify and simplify, as well as to reduce the impact of subjective factors in the mind of the administering official. To some extent amendments may reflect earlier departures in actual practice, to a large extent no doubt they are the product of experience. If anything has been slipped in which would impair vested rights unless limited to prospective application only, let it be pointed out. If we have erred in thinking the "Weighted guidelines method" is feasible to apply to the instant contracts, the Pentagon even now could amend or supplement its regulation, and the Board would be bound, provided no impairment of vested rights was attempted. Any amendment purporting to reaffirm the position now claimed, that officials determining a reasonable level of profit under clauses such as Article 6(e) are not subject to any published guidelines whatever in certain cases, at least would advisedly be made in light of the recent statement of the Supreme Court: " * * * a broad, roving authority, a type of administrative absolutism [is] not congenial to our law-making traditions."

Gutknecht v. United States, 396 U.S. 295, 90 S.Ct. 506, 24 L.Ed.2d 532.

## CONCLUSION

Plaintiff's motion for summary judgment and defendant's cross motion for summary judgment are denied. Further proceedings are stayed pursuant to Rule 167 for a period of six months to enable the parties to obtain further fact findings in accordance with this opinion under the applicable guidelines in published regulations. Plaintiff shall advise the commissioner of the status of the case before the Armed Services Board of Contract Appeals at intervals of not less than 60 days beginning with the date of this order, as prescribed in Rule 167(e) and (f).

DAVIS, Judge (concurring):

*Newport News,* which I consider now binding on me, settled the issue of whether the ASPR guidelines were required to be followed even though neither party invoked them before the Board. That being so, I agree with the court, for the reasons it gives, that those regulations apply to this case as well, and on that basis I join in the disposition requiring them to be applied here.

SKELTON, Judge (dissenting):

I respectfully dissent. In my opinion, Newport News Shipbuilding & Dry Dock Co. v. United States, 179 Ct.Cl. 97, 374 F.2d 516 (1967), does not control this case and it should not be sent back to the board (ASBCA) in order to allow it to use the guidelines of the Department of Defense regulation published in 1963 (28 Fed.Reg. 12546, 12555, amending 32 C.F.R. §§ 3.808 and ff. (part 3)), to determine the profit of the plaintiff in this case, for the following reasons:

(1) This regulation was not in existence at the time the contracts involved here were executed and could not have been contemplated by the parties. Although this same situation existed in *Newport News,* the facts in the two cases are completely different. There the court held that the regulation must be applied to the original competitive prices as well as to escalated prices, but that cannot be done in the instant case because the bids here were not competitive. It is improper to apply the regulation retroactively under these circumstances in our case. In fact, it is impossible to apply the decision in *Newport News* to the original prices here.

(2) The contracts before us were negotiated between the parties and were not the result of competitive bids. In fact, they amounted to a subsidy by the government, and without them the plaintiff would have had to have closed its doors and gone out of business. Plaintiff was not the lowest bidder, as two other companies submitted lower bids. The government gave it the contracts after negotiation to keep it in operation. As a result, the plaintiff has been subsidized to the extent of a five percent profit on the undertaking, but instead of being grateful for this generosity, now sues for more. It is impractical, if not impossible, to apply the regulation to the prices thus negotiated between the parties.

(3) The parties submitted guidelines to the Board that they wished it to consider. The Board did consider them fully, as indicated in its opinion. The plaintiff did not ask the Board to consider any additional guidelines and did not mention those set forth in the regulation which was in force at the time of the Board's decision. No request was made that the guidelines in the regulation be considered. It is too late, in my opinion, for the plaintiff to make such a request, and it is error for us to allow it to do so.

(4) The Board found *as a fact* that the parties agreed that plaintiff's profit would be five percent, and plaintiff has not challenged this finding. Consequently, the finding is final and we are bound by it and have no authority to set it aside.

I would grant defendant's cross-motion for summary judgment, deny plaintiff's motion, and dismiss plaintiff's petition.