**BETHLEHEM STEEL CORPORATION**

v.

**The UNITED STATES.**

No. 44–68.

United States Court of Claims.

Feb. 19, 1975.

**530**

George Vradenburg, III, New York City, for plaintiff. Albert R. Connelly, New York City, attorney of record.

Howard G. Slavit, with whom was Asst. Atty. Gen. Carla A. Hills, for defendant. Steven J. Bercik, Washington, D. C., of counsel.

Before DURFEE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

NICHOLS, Judge:

This case of Wunderlich Act review of a contract dispute under Dispute Clause procedure (41 U.S.C. §§ 321–322) is now before us for the third time. On the first occasion, 423 F.2d 300, 191 Ct.Cl. 141 (1970), we held that the Armed Services Board of Contract Appeals (ASBCA) had erred as a matter of law in not following certain Armed Services Procurement Regulations (ASPR) we considered applicable to the dispute. After Board preliminary proceedings reported at 71–1 BCA ¶ 8640, Bethlehem on May 10, 1971, applied to us for an order terminating stay and for other relief. This we denied in an unreported order, without opinion. The Board proceedings then resumed and resulted in the decision now under review, 73–1 BCA ¶ 9898. We affirm.

Our 1970 decision details the controversy as it had evolved up to that time and we need not repeat it all here. Briefly, Bethlehem had built five Navy destroyers under two fixed price contracts, Nobs–3556 and 3648, both of which contained clauses allowing for labor and material escalation, but enabling the Contracting Officer to deny any upward adjustment thereunder in whole or in part, if he found that it was not re-

quired to enable the Contractor to earn a fair and reasonable profit under the contract, Art. 6, Par. (e). After full performance, plaintiff claimed $3,347,000 escalation under Nobs–3556 and $2,404,900 under Nobs–3648. The latter claim has now been allowed by the Board in its entirety and having been dismissed is not before us for review. The original Board decision allowed $1,064,151 under Nobs–3556 making a total profit of 5% of costs. The Board's theory was that plaintiff had agreed to a limit of 5%. We were unable to find evidence of agreement to that limit. Further, the Board had determined the level of reasonable profit without reference to the published guidelines of the Department of Defense which told how contract clauses limiting contractors to reasonable profit levels (hereinafter, profit limitation provision) were to be interpreted and applied.

In Newport News Shipbuilding & Dry Dock Co. v. United States, 374 F.2d 516, 179 Ct.Cl. 97 (1967), we had already held that in making a profit limitation decision under a Navy contract clause of the same type, the Board had erred in not following published guidelines. On retrial, the Board, as we indicated it should, followed the guidelines enacted after the contract date and before its original decision, hereinafter called the "unweighted guidelines." It allowed Newport News full escalation, 71–1 BCA ¶ 8705. The case was settled on that basis. In *Bethlehem,* the fact appeared that the Department of Defense had superseded the original "unweighted guidelines" with so-called "weighted guidelines", after the original Board decision in *Newport News* and before that in *Bethlehem.*

Plaintiff in *Bethlehem* argued for use of the "weighted guidelines" on retrial. Defendant seemed to argue for no guidelines at all, attacking the "weighted guidelines" as unsuitable for the Bethlehem contract even if required for most others. This was because, in defendant's view, the "weighted guidelines" would fail to allow weight for the fact the

Navy had awarded this contract to Bethlehem, though it was a high bidder, to keep its Quincy, Massachusetts facility in the shipbuilding business. At that point, however, defendant indicated no preference for the "unweighted guidelines".

This issue caused us much concern. Since, in *Newport News* we had held a guideline regulation to apply to a contract written at an earlier date, when no guidelines existed, it seemed consistent that any further amending or superseding provisions should be applicable likewise, right up to the original Board trial on the facts. This would make the amended or "weighted guidelines" the proper ones to use in the Bethlehem retrial. What happens, however, if the guidelines are amended or modified again, between the original trial and retrial of the issue? In *Newport News,* apparently by mutual consent, the new guidelines were not given effect at the retrial and the Board used the ones it should have used at the original trial. It was nevertheless obvious to us that this was not the only possible answer.

The determination of a supposedly reasonable level of profit by administrative fiat after the event, and not by operation of the market place, is not an easy operation that anyone can perform. Without guidelines the power to do it confers, as we said in Bethlehem I, a kind of roving absolutism inimical to our institutions (423 F.2d p. 308, 191 Ct.Cl. p. 155). In the administration of our most widely used system of profit limitation under Government contracts, the Renegotiation Act of 1951, 50 U.S.C. (App.) § 1191 and ff., and its predecessors back to 1942, the need for guidelines has been recognized from the beginning, almost, and they are provided both in statutory provisions and in regulations. 50 U.S.C. (App.) § 1213(e); 32 C.F.R. § 1460.1 and ff. The ASPR indicated a recognition of the same need, and we were understandably reluctant to believe there could be any profit limitation provisions in Department of Defense contracts, they were not intended to apply to. By the same token, new regulations, we would

presume, reflected more extended experience with profit limitation, and would if applied to previously existing contracts, produce a more satisfactory result than previous regulations or no regulations at all. On the other hand, it certainly was possible the authors of regulations might be unaware at times of all the previously awarded contracts remaining unsettled, to which they might apply, and they might obtain unforeseen and undesired results. If this occurred, they should be free to correct their errors.

As we have recently held in Hills Transp. Co. v. United States, 492 F.2d 1394, 204 Ct.Cl. 51 (1974) whether, in the absence of express provision, a procurement regulation can have retroactive application to a contract earlier awarded, is not to be decided by any wooden rules, but by reference to the character and intent of the contract and of the regulation involved. Here, factors favoring retroactive application are the long lapse of time under these shipbuilding contracts, between original award and final settlement, and the remedial effect of a guideline regulation, any regulation, as against the assignment of a "roving absolutism" to a Contracting Officer in granting or denying escalation.

In view of the foregoing considerations we deemed it unwise to nail defendant inescapably to the mast of the "weighted guidelines" method. While stating that as things were, plaintiff was entitled to use of that method on retrial, we held that even then, defendant could make a retroactive change in the method. Our words, as reported, were as follows:

\* \* \* \* \* \*

As we have said, we see no injustice or anomaly in applying profit limitation techniques, as the Pentagon may have amended and prescribed them from time to time, up to the date of the determination. We would presume that changes were intended to clarify and simplify, as well as to reduce the impact of subjective factors

in the mind of the administering official. To some extent amendments may reflect earlier departures in actual practice, to a large extent no doubt they are the product of experience. If anything has been slipped in which would impair vested rights unless limited to prospective application only, let it be pointed out. If we have erred in thinking the "Weighted guidelines method" is feasible to apply to the instant contracts, the Pentagon even now could amend or supplement its regulation, and the Board would be bound, provided no impairment of vested rights was attempted. Any amendment purporting to reaffirm the position now claimed, that officials determining a reasonable level of profit under clauses such as Article 6(e) are not subject to any published guidelines whatever in certain cases, at least would advisedly be made in light of the recent statement of the Supreme Court: " * * * a broad, roving authority, a type of administrative absolutism [is] not congenial to our lawmaking traditions." Gutknecht v. United States, 396 U.S. 295, 306, 90 S.Ct. 506, 24 L.Ed.2d 532 (1970). [423 F.2d at 307, 191 Ct.Cl. at 154–55.]

It was express that the change should, if made, be in the regulations, and therefore by the rule-making arm of the Secretary of Defense, not his adjudicatory arm, the ASBCA. A change in the rules by the latter would be nothing but a reversion to the "do it yourself guidelines" and "seat of the pants navigation" we condemned in the *Newport News* decision and again in this. Members of the ASBCA are required to be "learned in the law" and can hardly be also expected to be so expert as not to need guidance as to the techniques of reasonable profit determination. If the rule-making body was to change the rules, it was implicit that body should follow its customary formalities in making rules, and receive the advice from within and without the Government that it normally would. Both the "unweighted guidelines" and the "weighted guidelines" afford inter-

nal evidence that the needed expertise exists within or is available to the Department of Defense. A third implicit requirement was that the purported "rule" should really have general application and not be just an attempt to influence a lawsuit. We referred to "The Pentagon" meaning that all bodies in or about that vast structure might perform in the roles appropriate to them under the organization of the Department.

What actually happened was put before us in Bethlehem's 1971 motion. It is assumed for purposes of this opinion that our denial of the motion did not establish a "law of the case" barring consideration now. The ground was unstated and it could have been on several grounds.

Shortly after our decision came down the Navy legal member put before the ASPR Committee, the rule-making committee having supervision over the ASPR, a request for a "deviation". Quoting parts of our decision, he advanced the Navy's position that the "weighted guidelines" were not intended to apply to contracts awarded, as Bethlehem's was, before 1963. The Committee decided, as recorded in its minutes, that mandatory retroactive application of the weighted guidelines was not intended, and particularly with respect to escalation clauses. Deviation was not required. The Committee also agreed application of the weighted guidelines was not feasible and they were intended only for negotiation of future contracts. A deviation was approved to the extent others might think the guidelines applied. In taking this action, the Committee recognized it would leave the unweighted guidelines in ASPR 3–808 for application. They were not considered as effecting a substantive change in the contract. The Navy member had listed ten contracts with unsettled escalation claims under similar clauses, to which the "deviation" would apply. This included the two Bethlehem contracts here involved. The Navy's reason for asserting unfeasibility appears to have been

primarily that the "weighted guidelines" effectuated an objective that obtained in 1963 to attract more contractors to defense work. This need did not exist in 1954 when the Bethlehem contracts were awarded and the object was then to place contracts at the lowest possible prices.

The ASBCA subsequently held, correctly it would appear, that under ASPR 1–109.3, the Committee had authority to approve a "deviation" of this kind, provided it was unanimous, and a major policy was not involved. Both these conditions were satisfied. *See* also DOD Instr. 5126.3, December 20, 1961; Government Contract Reports § 825. It could have published a regulation or directive, without higher level approval, subject to those conditions.

The ASBCA considered it was bound by this "deviation" to apply the unweighted and not the weighted guidelines. It correctly read our decision as holding that it was not the proper body to make this kind of decision, and that one properly made elsewhere would bind it.

The Board, after trial, applying the non-weighted guidelines, awarded plaintiff full escalation under Nobs–3648, but only $687,840 additional escalation over the previous decision under Nobs–3556, being 6.3% of cost. The sum of $2,282,-849 would have been required for full escalation, and the Board denied the excess of this figure over $687,840.

Plaintiff does not attack the Board's techniques in applying the unweighted guidelines, or rather its attack does not focus upon any variation between those techniques and one or more identified parts of the non-weighted guidelines themselves. In general, the Board appears to make a conscientious and reasoned effort to apply them fairly. Plaintiff says it has a "vested" right to the "weighted guidelines" and under them would recover full escalation as a mathematical certainty. We are not so sure as to that but defer to the Pentagon's experts who, as plaintiff notes, themselves believe such guidelines would produce substantially higher results, at least.

If defendant wanted to use the unweighted guidelines, it is regrettable it did not so inform us in 1970. To have disposed of all Art. 6(e) escalation claims by a uniform method would have had advantages apparent to any mind, and the method was already in use for *Newport News*. Any benefit from future advances in profit control technique could have been sacrificed in the circumstances. Nor did defendant tell us then that the weighted guidelines were purposely inflated to attract more bidders. We also deplore the failure to inform Bethlehem of the contemplated change in the rules. There are certain amenities normally to be expected in the conduct of litigation. To obtain *ex parte* a change in the ground rules and present them to the adjudicating tribunal as *fait accompli* and binding on it, will not impress the ordinary mind as entirely cricket. However, our problem is whether to react only to clear cut and demonstrated illegality, or whether to allow our sense of undirected outrage to prolong this already inordinately prolonged litigation, to the advantage of no one knows whom. In the case of the Government, we realize that the right hand often does not know what the left hand does. Actions are taken that are, in the aggregate, outrageous, yet may be quite innocent in the minds of the individual actors.

We cannot make our own determination of a reasonable profit level in view of our holding in *Newport News* that the issue is factual, and our obligation to leave factual issues to Board determination despite previous errors, unless the Board procedure is inadequate and unavailable. United States v. Anthony Grace & Sons, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966). The slow progress of this case does not seem imputable to the Board so much as to the novelty of the issues and the complexity of the case. If the job of determining a reasonable profit level has to be done all over again, it is the Board that must do it.

The "unweighted guidelines" used here were considered and approved by us in the *Newport News* case *supra*. No

contention is made that these guidelines are not fair and reasonable, of themselves. In plaintiff's eyes, they are just not as productive of a high level of reasonable profit as the preferred set. As a matter of fact the "unweighted guidelines" bear a strong family resemblance to the Congressionally enacted set in the Renegotiation Act, *cit. supra.* In adjudicating *Bethlehem* I, we formed the impression the Department of Defense had abandoned them as unsatisfactory, but this is now shown to have been erroneous. The "weighted guidelines" were put in effect for wholly different reasons, as has appeared above.

Plaintiff's serious legal attack on the Board decision has three main heads: (1) the alleged *ex parte* approach by the Navy member to the ASPR Committee, (2) that Bethlehem has a vested right in use of the "weighted guidelines" method, and (3) that it was "feasible" to use those guidelines.

■ 1. As a matter of law, this court has often regarded *ex parte* approaches as invalidating adjudicatory actions. Camero v. United States, 375 F.2d 777, 179 Ct.Cl. 520 (1967); Jarett v. United States, 451 F.2d 623, 195 Ct.Cl. 320 (1971). However, it has not attempted to apply the same standards to rule making. Everyone knows that an *ex parte* approach may lie behind many a statute. When we indicated therefore, that a change in the rules must originate in a rule making body, we indicated that such a change might be effected by the procedures normal to such bodies. Plaintiff has not cited a statute or regulation applicable to the ASPR Committee, invalidating an *ex parte* approach by one of its members. We wonder if an approach to an organized body by one of its own members can ever be deemed *ex parte* in the pejorative sense of the word.

■ 2. Plaintiff also says it had a vested right in the use of the "weighted guidelines" procedure. This echoes a provision in our former opinion, quoted above, intimating that in changing its regulation, the defendant could not impair vested rights. Where does the alleged vested right of the plaintiff originate? Not in the contract, wherein plaintiff did not bargain for use of any method of determining a reasonable level of profit in case Art. 6(e) had to be administered. Not in the regulation itself, since our reading of it makes it inherently subject to change, unless the change impairs vested rights of other origin. Not in our former decision. We are not empowered to create vested rights against the Government except in the form of money judgments. Such rights might come into being as *res judi-cata,* collateral estoppel, or "law of the case", but we see none of these here. There has been no final judgment to give rise to the first two, and as to law of the case, it works against plaintiff if at all, insofar as our "law of the case" stated in Bethlehem I was purposely hedged, and plaintiff's contention just comes back to depend on plaintiff's interpretation of that decision, which we reject.

The irreparable flaw in plaintiff's claim to a vested right in the "weighted guidelines" is that in 1954 plaintiff deliberately made contract Nobs–3556, including Art. 6(e). If Art. 6(e) subsequently came up for implementation, the most plaintiff could demand was determination of its acceptable profit level by some fair and reasonable method, of general applicability, and not one freshly invented for its particular case. This has now been accorded to it.

■ 3. Plaintiff also says it would be "feasible" to apply the "weighted guidelines" echoing our language that these guidelines might be changed if it were not "feasible" to use them. Plaintiff also says use of these guidelines leads inexorably to allowance of its entire escalation claim without deduction. The Board in response quotes dictionary definitions of "feasible" as "possible" or "practicable" or "capable of being done", and other definitions as what is "suitable" or "reasonable". It concludes, correctly, that we intended the broader meaning. The paragraph taken as a whole, indicates that a general change in

the regulations made for any legitimate reason is acceptable. "Unfeasibility" of the prior regulation is merely an example. We regret having used such an ambiguous terminology. In the area of profit limitation the subjective cannot be avoided entirely. If a technique of determining a reasonable level of profit produces a result that shocks the sense of fairness or justice, use of it is not "feasible", and should be avoided.

■ The Board also points out, correctly, that the major premise of *Bethlehem* I decision was our objection to decision of profit limitation issues under Art. 6(e) of the involved contracts, by the use of do-it-yourself or seat-of-the-pants guidelines. A minor premise was the belief, right or wrong, that the regulations provided proper published guidelines for all cases, and the conclusion, that such published guidelines should be followed. As the Board points out, use of the "unweighted guidelines" per rule adopted under the ASPR constitution, implements, rather than violates, every significant part of our decision. Had we known they wanted to use the "unweighted guidelines" we would probably have expressed our approval. We may have thought matters would be handled differently than they were, in some respects, but we did not frame a mandate to demand all that we expected. Indeed, to describe our opinion as a mandate at all is an exaggeration. In 1970 we did not have the power to tell the Board what to do, that we now have under 28 U.S.C. § 1491, as amended by Pub.L. 92-415. The Board suspended the case to allow plaintiff to apply to this court when it declared its dissatisfaction with the guidelines to be followed. It did more than the law then required of it, to ascertain our wishes and apply them. Our so-called mandate was in reality, and was intended, more as a summary of the legal options open to defendant on the retrial of the case.

■ In view of the foregoing, the Board decision under review is not contrary to substantial evidence, is not contrary to law, and is not arbitrary or capricious. By Wunderlich Act standards, it must therefore be affirmed.

Plaintiff's motion for summary judgment is denied. Defendant's cross motion for summary judgment is allowed. Judgment is entered for plaintiff in the amount determined by the Board, which was for Contract Nobs–3556, $1,064,151 under the original decision and $687,840 additional under the decision now under review, or a total of $1,751,991, with adjustment for any portion of the said sum already paid.

BENNETT, Judge (dissenting):

During the year 1954, plaintiff was awarded two contracts, Nobs–3556 and Nobs–3648, for the construction of three destroyers and two destroyers, respectively. Plaintiff was not the low bidder for the Nobs–3556 contract, but was awarded the contract nevertheless in pursuance of the Government's policy of continuing the existence of an essential defense facility. Plaintiff was the only shipbuilder asked to submit a proposal for Nobs–3648, and, on the same policy ground, was awarded that contract as well.

Both contracts contained provisions requiring the contractor to exclude from its cost estimates any contingency allowances intended to offset anticipated increases in labor and material costs during the period of construction. In return, the Government promised to reimburse the contractor, according to an agreed formula, for any increases in labor and material costs which ultimately occurred during that period, except as limited by the following article 6(e) of the contracts:

> (e) The Contracting Officer may deny, in whole or in part, any upward adjustment in the contract price required under this Article if the Contracting Officer finds that such adjustment is not required, in whole or in part, to enable the Contractor to earn a fair and reasonable profit under this contract.

When plaintiff entered into the contracts at issue, there were no published guide-

lines for determining "fair and reasonable profit" in a given case. Sometime prior to August 1963 the Department of Defense published "unweighted" guidelines, and in August 1963 those unweighted guidelines were superseded by the "weighted" guidelines method of determining reasonable profits. 32 C.F.R. §§ 3.808–1 et seq. (1965).

When plaintiff's contracts were completed (the last of the five destroyers was delivered on February 26, 1958), plaintiff sought from the contracting officer labor and material escalation costs of $3,347,500 on Nobs–3556 and $2,404,900 on Nobs–3648. In neither case was the amount of the escalation costs in dispute, but the contracting officer refused to permit recovery of any of those costs on the basis that such adjustment was unnecessary "to enable the Contractor to earn a fair and reasonable profit." Article 6(e), *supra*. If the decision of the contracting officer had stood, plaintiff's profit on the two contracts would have been 3 percent and 2.3 percent of cost, respectively; the full escalation sought by plaintiff, on the other hand, would result in profit margins of 9.3 percent and 9.6 percent.

Plaintiff's appeal to the ASBCA from the contracting officer's decision was partially successful, the board awarding plaintiff that portion of escalation costs which brought its profit margin on both contracts to 5 percent of cost. Though the weighted guidelines were in effect at the time of the board's decision, the board did not use them or refer to them.

Plaintiff appealed to this court from the ASBCA decision. The result was the court's opinion in Bethlehem Steel Corp. v. United States, 423 F.2d 300, 191 Ct.Cl. 141 (1970), which is hereafter referred to as *Bethlehem I.* In that opinion the court recalled that in an earlier case with very similar facts,[1] it had applied the existing Department of Defense regulations which set out unweighted guidelines for determining a reasonable profit

margin, to a contract entered into prior to the effective date of those regulations. It followed that in *Bethlehem I* plaintiff was also entitled to application of the existing regulations, *i. e.,* the weighted guidelines, and the court so held (with a reservation to be discussed, *infra*):

> * * * Plaintiff desires to take its chances under the "Weighted guidelines method" and it has a legal right to do so. [423 F.2d at 307, 191 Ct.Cl. at 154.]

Indeed, even defendant in *Bethlehem I* accepted the general principle that the weighted guidelines should apply to contracts entered into prior to the regulation's effective date:

> * * * Defendant does not now deny that it [the regulation setting out the weighted guidelines] would govern most decisions limiting or refusing otherwise justified labor and material escalation under Article 6(e), and there is nothing in it [the regulation] that suggests an intent to narrow the former scope. * * *. [423 F.2d at 305, 191 Ct.Cl. at 150.]

Defendant argued in *Bethlehem I,* however, that plaintiff should be an exception to the rule because plaintiff had been awarded the shipbuilding contracts in spite of the fact that other contractors could have built the ships at lower cost, and in order that plaintiff would not close down its facilities. In rejecting this argument, the court noted, first, that the desired exception was not to be found in the regulation and had "every earmark of having originated in the active mind of defense counsel."[2] The court also rejected defendant's assertion that the parties had agreed to a profit level of 5 percent in consideration of plaintiff's being awarded the contract, and that the weighted guidelines would result in a higher unintended level of profits:

> * * * The alleged agreement to a 5% level, in a contract that viewed

1. Newport News Shipbuilding & Dry Dock Co. v. United States, 374 F.2d 516, 179 Ct.Cl. 97 (1967).

2. 423 F.2d at 305, 191 Ct.Cl. at 151.

prospectively could have resulted in anything from a loss to a windfall profit level, according to its terms, must be regarded as located in defendant's counsel's eyes alone. [423 F.2d at 306, 191 Ct.Cl. at 152.]

After its determination that plaintiff had a "legal right" to application of the weighted guidelines, however, the court added the following comments:

As we have said, we see no injustice or anomaly in applying profit limitation techniques, as the Pentagon may have amended and prescribed them from time to time, up to the date of the determination. We would presume that changes were intended to clarify and simplify, as well as to reduce the impact of subjective factors in the mind of the administering official. To some extent amendments may reflect earlier departures in actual practice, to a large extent no doubt they are the product of experience. If anything has been slipped in which would impair vested rights unless limited to prospective application only, let it be pointed out. If we have erred in thinking the "Weighted guidelines method" is feasible to apply to the instant contracts, the Pentagon even now could amend or supplement its regulation, and the Board would be bound, provided no impairment of vested rights was attempted. * *. [423 F.2d at 307, 191 Ct.Cl. at 154.]

Seizing upon the above comments, which the majority now identifies as an option open to defendant on retrial of the case, the Navy promptly requested from the ASPR committee a "deviation" from the use of weighted guidelines with respect to plaintiff's contracts and eight other shipbuilding contracts. The ASPR committee granted the deviation, stating that application of the weighted guidelines to contracts entered into prior to the effective date of the regulation is not feasible, since the weighted guidelines effect a substantive change in the standards existing at the time the contracts were entered into and were intended for the development of a profit objective for negotiation of future contracts. In lieu of the weighted guidelines, the ASPR committee prescribed application of the superseded unweighted guidelines to plaintiff's contracts.

Defendant was successful in convincing the ASBCA to follow the ASPR committee's "deviation" and thus to apply the unweighted guidelines. In doing so, the ASBCA ruled that plaintiff was entitled to full escalation on the Nobs–3648 contract, but only partial escalation (to a 6.3 percent profit margin) on the Nobs–3556 contract. Plaintiff is convinced, and defendant's actions seem to confirm the fact, that if the ASBCA had used the weighted guidelines rather than the unweighted guidelines, plaintiff would have recovered virtually all of the escalation under the Nobs–3556 contract. Plaintiff thus requests that this court reaffirm its statement in *Bethlehem I* that plaintiff has a "legal right" to application of the weighted guidelines.

The issue presented for decision here is easily stated. Has defendant shown that the weighted guidelines method is not "feasible" to apply to the contract at issue? If not, then plaintiff has a legal right to its application. It is my belief that the weighted guidelines are entirely feasible to apply and that plaintiff should receive the benefit of their application. I would remand to the board for that purpose.

The term "feasible" has, of course, more than one meaning. As Judge Nichols indicates, it can mean "possible" or "reasonable" or "suitable." There can be no dispute that it is possible to apply the weighted guidelines to plaintiff's contracts. In fact, both plaintiff and defendant are able to anticipate what the approximate result of such an application would be. Furthermore, it would not be "unreasonable" to apply those guidelines in the sense that their use would result in an unusual or absurd result, or as Judge Nichols states, one that "shocks the sense of fairness or justice." Rather, it appears that if they were used appropriately in the manner demonstrated in some detail by the court

in *Bethlehem I,* the result would be an indicated profit margin for plaintiff of between 9 percent and 12 percent. The maximum profit plaintiff can receive from escalation here is 9.3 percent, in any event.[4]

Defendant has suggested three reasons why the use of weighted guidelines is "unsuitable," if we are to use this as the definition of the word "feasible." I will deal with them in turn.

First, defendant states that it is desirable that all shipbuilding contractors whose contracts contained article 6(e) should have the reasonableness of their profits determined by the same method —namely, unweighted guidelines. But there is no inherent reason why this should be so. We were aware in *Bethlehem I* that the unweighted guidelines had in all likelihood been applied in the *Newport News, supra,* contract, and others. We nevertheless stated that plaintiff was entitled to the benefit of the *existing* regulation specifying weighted guidelines. It was presumed that the weighted guidelines represented an improvement over the earlier method, particularly because they reduced the "impact of subjective factors in the mind of the administering official."[5] Moreover, defendant's interest in consistency was not apparent in *Bethlehem I* wherein defendant argued that *no* guidelines should be applied to determine the reasonableness of plaintiff's profits. It seems that defendant desires consistency of treatment only when it sees some advantage to itself arising therefrom.

The second of defendant's arguments with respect to feasibility is that the greater profits which plaintiff would receive upon application of the weighted guidelines were not contemplated when the contract was entered into. The short answer to this contention is that the court expressly rejected it in *Bethlehem I*; the court stated that there was no agreement respecting profit, and that

the contract could have resulted in anything from a loss to a windfall profit level, as both parties realized.

The third and final of defendant's arguments is a reiteration of the ASPR committee's stated reason for granting the deviation. That reason, as has been stated above, was that retroactive application "is not feasible, since it [the weighted guidelines] effected a substantive change in the standards existing at the time the contracts were entered into and were intended for the development of a profit objective for negotiation of future contracts." Looking first to the alleged frustration of "intention," it is noteworthy that there is no evidence in the record to support the ASPR committee's statement that only prospective application was intended. As the court noted in *Bethlehem I,* the regulation contains no such limitation and there is no reason to infer one. In addition, defendant did not argue in *Bethlehem I* for prospective application only, but agreed rather that the regulation would generally cover contracts such as the one in question. Even the "Notes and Filing Instructions" which accompanied the regulation and which were cited by the ASPR committee state:

> The revised paragraph 3–808 is authorized for immediate use and maximum practical use is encouraged. However, to allow for an initial training period in the use of the weighted guidelines method, mandatory use is not required until after 1 January 1964. Mandatory use is prescribed for all applicable procurements initiated after 1 January 1964.

Defendant argues further, though, that the fact that the weighted guidelines had the potential for higher profits in order to attract the "best possible industrial capabilities" proves that only prospective application was intended. The conclusion does not follow from the premise, however. First, it should be

4. Other shipbuilding contractors received escalation, even though such escalation brought profit levels to 15.2 percent, 15.32 percent, and 10.1 percent in three instances.

5. 423 F.2d at 307, 191 Ct.Cl. at 154.

noted that the court in *Bethlehem I* was aware that the regulation had the potential for greater profits. The regulation itself, section 3.808–1(a), states that use of weighted guidelines "will result in a wider range of profits which, in many cases, will be significantly higher than previous norms." The regulation also states that effective national defense requires attraction of the "best industrial capabilities" and that such capabilities would be dissuaded by "low profit opportunities." Thus, the ASPR committee said nothing which the court had not already read in the regulation itself. Secondly, though the emphasis on potentially higher profits may have been directed to attracting future business, this does not prove that prior contracts were to be excluded from coverage, in the absence of a statement to that effect which could easily have been written into the regulation. The court was aware at the time of *Bethlehem I* that the guidelines, whether weighted or unweighted, were used primarily in negotiating the price to be paid a contractor on a future contract. Determining reasonable profits after completion of contract performance is an unusual situation. Nevertheless, in both *Newport News, supra,* and *Bethlehem I,* the court found that absent language in the regulation to the contrary, the existing guidelines were to apply. Indeed, there is no reason why the guidelines cannot be applied. The "Notes and Filing Instructions" accompanying the weighted guidelines include the statement: "This method is a rational, uniform, and equitable approach for evaluating the factors which must be considered in determining a proper profit or fee objective." What is rational, uniform, and equitable for others is equally so for plaintiff.

The ASPR committee's statement that the weighted guidelines represent a substantive rather than a procedural change contradicts the entire basis for decision in *Bethlehem I* and must be dismissed. The new regulation does not guarantee higher profits, but represents simply a less subjective method of determining fair and reasonable profit. That the less subjective procedure has the potential for higher profit computations only confirms the known fact that changes in procedure can have an effect on substance.

To summarize thus far, I have demonstrated that there is no valid reason why the weighted guidelines cannot feasibly be applied to plaintiff's contract. Indeed, neither the ASPR committee nor counsel in this case has brought anything to the court's attention which the court was unaware of at the time it stated that plaintiff had a legal right to the application of weighted guidelines, or which could have had a bearing on the court's decision. Defendant is in reality still clinging to its assertion, rejected in *Bethlehem I,* that the parties did not contemplate that plaintiff would recover more than a 5 percent profit.

The majority opinion states that the court's opinion in *Bethlehem I* was less a "mandate" than a "summary of the legal options open to defendant." If this be so, and surely it is not, then *Bethlehem I* was no more than an advisory opinion—something which this article III court has no authority to give. In reality, *Bethlehem I* mandated that the weighted guidelines be used, but protected its flank by suggesting that if, for reasons unknown to the court, the application of weighted guidelines would lead to an unfair or absurd result, "the Pentagon" could amend or supplement the regulation to prevent such a result. The court did not give "the Pentagon" *carte blanche* to evade the mandate on any pretext, or, as Judge Nichols states to "attempt to influence a lawsuit." Yet the Pentagon attempted to do just that.

This case bears a certain similarity to Pacific Far East Line, Inc. v. United States, 394 F.2d 990, 184 Ct.Cl. 169 (1968). In that case MARAD adopted new criteria for determining the amount of profits which the Government could recapture from a subsidized ship operator. MARAD had originally indicated that the new criteria would be retroactively applied to Pacific Far East Line's

earlier years of operation, but when it realized that this would benefit PFEL in the sum of $750,000, it withdrew retroactive application. The court would not permit such a reversal by MARAD for the following reason:

> * * * We are left with the bald circumstance that MARAD changed its method of accounting after it discovered that PFEL was entitled to a large sum under its original procedure. MARAD's only concern must have been to secure for the defendant the maximum amount of money in the form of recapture. As such, this situation takes on the appearance of market place haggling and unreasonable retroactivity which offended this court in American President Lines, Ltd. v. United States, 291 F.2d 931, 936, 154 Ct.Cl. 695, 705 (1961). * * *. [394 F.2d at 1001, 184 Ct.Cl. at 189.]

In the same way, defendant in this case has reversed itself with regard to the use of weighted guidelines after realizing that plaintiff stands to recover greater profits from their use. Defendant's evasion of the *Bethlehem I* decision in order to influence the results in this lawsuit should not be permitted. Defendant has failed to show weighted guidelines are not feasible here or would produce unfair or absurd results. The majority opinion upholding defendant's change of rules in the middle of the game impairs plaintiff's vested rights against "roving administrative absolutism." The majority condemns as not "cricket" and as "deplorable" and as "outrageous" what has happened here but tolerates it. This is because the issue of a reasonable profit level is said to be factual and for administrative determination according to guidelines which are fair and reasonable and of general application although subject to change at any time for any legitimate reason. My conclusion is that even as stated the test does not fit the facts before us in such a way as to support the majority's result in the case.

I have dealt above with the first of two main arguments plaintiff makes in this case, namely, that the weighted guidelines should have been applied because infeasibility thereof has not been demonstrated, particularly because this court in *Bethlehem I* was aware of the factors relied upon by defendant as allegedly showing infeasibility. However, plaintiff has a second cogent argument. Plaintiff says that the board acted arbitrarily and capriciously in applying unweighted guidelines. The majority opinion passes off without elaboration or refutation this second argument which plaintiff develops at length. Plaintiff makes a good case against the board's implementation of the unweighted guidelines. On either or both grounds plaintiff should prevail, and defendant should lose this case.

DURFEE, Senior Judge, and KUNZIG, Judge, join in the foregoing dissenting opinion.