**AMERICAN PRESIDENT LINES, LTD.**

v.

**UNITED STATES.**

No. 420–58.

United States Court of Claims.

July 19, 1961.

Warner W. Gardner, Washington, D. C., for plaintiff.

Lawrence F. Ledebur, Washington, D. C., with whom was Asst. Atty. Gen., William H. Orrick, Jr., for defendant. Carl C. Davis, Washington, D. C., was on the brief.

MADDEN, Judge.

The plaintiff sues to recover money which, it says, the Government illegally "recaptured" from it in connection with a ship subsidy contract between the plaintiff and the Government. Only the plaintiff's right to recover is presently before us. The amount of the recovery, if any, has been reserved for further proceedings.

The Merchant Marine Act of 1936, 49 Stat. 1985, 46 U.S.C.A. §§ 1101–1294, authorized the Government, in certain circumstances, to pay subsidies to American ship operators in order to make their operations competitive with those of foreign operators whose costs of operation are substantially lower than those of American operators. But in order to insure that subsidized operations would not be unreasonably profitable to the operators, section 606(5) of the 1936 Act, 46 U.S.C.A. § 1176(5) provided for the recapture by the Government of one-half of the net profits earned by a subsidized operator in any 10-year "recapture period", which net profits are in excess of 10 percent per annum of the "capital necessarily employed" by the subsidized operator. Section 607(d) of the 1936 Act, 46 U.S.C.A. § 1177(d), provided that "capital necessarily employed" should be defined by regulation of the United States Maritime Commission, which was the Government agency charged with the administration of the 1936 Act.

Since, under the statute, the ship operator could keep his profits up to the amount of 10 percent of the "capital necessarily employed" but had to give the Government one-half of all profits above

that ten percent, it is apparent that the amount of the "capital necessarily employed" is a factor of the greatest importance in the administration of the ship subsidy contracts. And, as we have seen, the statute authorized the Maritime Commission to define, by regulation, how that key factor should be determined.

The initial subsidy contracts, made soon after the enactment of the 1936 Act, provided that the capital necessarily employed by the operator was his net worth. In 1940 the Commission, by General Order No. 31, formally defined the factor as net worth.

There were 12 operators of ships, including the plaintiff, who had subsidy contracts made in the years 1937 and 1938. The outbreak of the war greatly increased the profits of the subsidized lines, and correspondingly increased their net worth. In 1940 the Commission decided, in principle, that the definition of capital necessarily employed ought to be changed. However, it had issued no regulation changing General Order No. 31 when the United States entered the war and requisitioned all merchant vessels, thus suspending all subsidized operations.

Although subsidized operations were suspended, the existing subsidy contracts were kept alive by the conditional extension of their termination dates, so that subsidized operations could be resumed after the war. The operators had received large amounts of money for the requisition by the Government of their ships, and for insurance on ships sunk, and had had no opportunity to invest it in new ships, until some time after the war.

The Maritime Commission authorized the renewal of subsidized operations on January 1, 1947, provided that all conditions which the Commission might impose were agreed to and incorporated into the subsidy contracts. A subsidy contract with a particular operator includes a great amount of detail with regard to the types of ships to be used, trade routes, minimum and maximum sailings and many other items. Hence, although subsidized operations were permitted to be resumed on January 1, 1947, the first

actual signing of the amended contracts did not occur until about January 1, 1950. From January 1, 1947, then, the subsidized operators were working without contracts, and on faith that satisfactory contracts would ultimately be made, and made effective as of January 1, 1947.

It will be remembered that the recapture of one-half the profits of subsidized operators, in excess of 10 percent of return on capital necessarily employed, was to be computed on the basis of 10-year periods. The 12 operators which had made their contracts in 1937 and 1938, which contracts were kept alive, though under suspension, during the war, were still, on January 1, 1947, within their ten-year recapture-of-profits period. And either their contracts as written, or General Order No. 31 issued in 1940, defined their capital necessarily employed as their net worth.

At the end of the war, for the reasons mentioned above, the operators were long on cash and securities and short on ships, hence the net worth definition allowed them to retain 10 percent of profits computed on large amounts of capital not really employed in the shipping industry. The staff of the Maritime Commission in 1946 proposed to the Commission a supplement to General Order No. 31 which would have eliminated many items of cash and securities from the factor of capital necessarily employed, and would have been effective January 1, 1947. The operators objected to the change, chiefly on the ground that they were holding the cash and securities for the purpose of acquiring ships as soon as ships were available. The Commission rejected the definition proposed by its staff.

A new definition, still more disadvantageous to the operators, was proposed to the Commission in 1949. It was adopted by the Commission as General Order No. 71. It provided effective dates ranging from December 31, 1947, to December 31, 1950, for the various operators, and, a matter of great importance, it allowed the net worth factor of General Order No. 31 to remain applicable, for each operator, during the ten-year recapture period

which had begun in 1937 or 1938 when the operator began its subsidized operation.

The promulgation of General Order No. 71 on December 21, 1949, made possible the closing of subsidy contracts with those operators as to which the other details of their contracts had been agreed upon. Five contracts were executed within two weeks, two more early in 1950, and one in March 1951. This accounted for eight of the twelve subsidized operators. These eight operators got the advantage, then, of the net worth factor from January 1, 1947, the date of their resumption of subsidized operations, to the date later in 1947 or in 1948 when their original ten-year recapture period had expired. From the date of the end of their recapture period, these operators would have their capital necessarily employed factor determined by the new and less favorable definition contained in General Order No. 71.

In the early part of 1950 there was vigorous criticism of the Maritime Commission by the General Accounting Office and by the House of Representatives Committee on Expenditures in the Executive Departments. One ground of criticism was the Commission's failure to make the new definition, more favorable to the Government, of capital necessarily employed, which new definition was contained in General Order No. 71, applicable to all subsidized operators from January 1, 1947, instead of from the dates of expiration of their ten-year recapture periods.

On May 24, 1950, the Maritime Commission was abolished and its functions were transferred to the Federal Maritime Board and the Maritime Administration. The Board referred the problem of capital necessarily employed to its staff. The staff requested the eight operators whose new contracts provided that General Order 31 should continue to apply to their operations until the end of their recapture period, to consent to a roll-back of the General Order 71 definition to January 1, 1947. The operators refused to consent. There was extensive study by the staff and negotiation with the operators. In April 1951, the Board approved a staff recommendation that the four operators whose contracts had not yet been executed be required to agree in their contracts, that after the contracts had been made the Board should still have the power to modify the terms of General Order No. 71, including its effective date, and apply the modified terms to these four operators.

The operators, apparently all of them, protested both the legality and the equity of the proposal. They knew that the purpose of the proposal was to get from the four operators contractual consent to a roll-back to January 1, 1947, if the Board should decide to make that date the effective date of General Order No. 71.

Two of the remaining four operators, one in June and the other in August, 1951, waived subsidy payments for the period from January 1, 1947, to the end of their recapture periods. That left only the plaintiff and Oceanic Steamship Line with their contracts unsettled.

A hearing, with oral argument, on the staff proposal to amend General Order No. 71, was held on July 11, 1951. The shipping industry opposed the proposal on the ground that it would be retroactive and discriminatory. More than a year later, on September 17, 1952, the Board announced its decision. The decision was to make the order effective, as of January 1, 1947, for those operators whose subsidy contracts were executed after April 30, 1951. The plaintiff and Oceanic would be the only operators answering that description.

The Board, in its decision, said that it could not apply the roll-back to the eight operators with which the Commission had signed contracts, because that would violate their contracts and also violate the Congressional objective of a "fair measure of stability" in subsidy contracts. It said that equality of treatment of all the subsidized operators would be desirable but that the fact that contractual rights prevented the roll-back as to the operators with whom contracts had been completed could not be permitted to compel the

Board to apply to the operators who did not have contracts a rule which, in the opinion of the Board, should not have been applied to any of the operators.

We now narrate the course of dealing between the plaintiff and the Commission, and later the Board. The plaintiff, after the war, resumed commercial operations in 1946, and, subject to the anticipated subsidy contract, resumed subsidized operations on January 1, 1947. In February 1947, the Commission assured the plaintiff that, subject to the making of the necessary findings and determinations as to routes, sailings, competitors' costs, etc., the Commission would be able to act on the plaintiff's contract "at an early date." Similar assurances were made to the plaintiff in 1948, 1949, and 1950. During the years 1947–1951 the plaintiff took many actions, including construction, purchase, and chartering of ships, ·on the assumption that it was a subsidized operator. It complied with all the obligations of a subsidized operator, but it could not actually collect any subsidy payments because its contract had not been executed. On May 13, 1949, the Commission sent the plaintiff a 13-page letter reciting the terms which the plaintiff's contract would contain. The Commission requested the plaintiff to show its agreement by endorsement on a copy. The plaintiff answered by a letter in which it pointed out the need for minor changes in route descriptions and annual sailings and, except for these suggestions, agreed to the Commission's proposed contract. The Commission's staff later described the plaintiff's letter as an acceptance, with certain reservations, of the Commission's proffered contract. That proffered contract included the application of the General Order No. 31 net worth definition of capital necessarily employed.

A letter similar to the Commission's letter of May 13, 1949, was sent by the Commission to Moore-McCormack Lines, Inc. on February 11, 1950. Moore-McCormack endorsed a copy, but noted that it was sending separately a request for revision of route descriptions and sailing schedules. The Board on March 8, 1951, gave Moore-McCormack a contract including the application of General Order No. 31 down to the end of that company's ten-year recapture period. The Board said that its correspondence with Moore-McCormack made an informal but nonetheless binding contract. There was, in fact, no significant difference between the situations of the plaintiff and Moore-McCormack as regarded the incompleteness of their contracts at the time that the Board succeeded to the Commission on May 24, 1950.

Among the causes for delay in completing the plaintiff's subsidy contract were the computation of foreign-flag costs, a hearing on the right to carry intercoastal traffic, doubts as to whether there was enough foreign-flag competition to warrant subsidy on the trans-Pacific passenger liners, differences of opinion within the Government on the proper construction-differential subsidy rate for vessels being constructed or improved by the plaintiff, and discussions as to the plaintiff's vessel replacement program.

On April 3, 1951, the Board approved a staff recommendation as to the terms of the plaintiff's contract, including a clause to the effect that the plaintiff agreed to any change in General Order No. 71, including its effective date. A more refined draft was completed on July 16, 1951. That draft, and the final contract, contained an Article I–14(c) (1) which provided:

"(1) The Operator agrees to accept any changes by the United States in the definition of the term 'Capital Necessarily Employed * * 'Capital Necessarily Employed * * * ' as set forth in General Order 71 * * *, including, without limitation, changes with respect to the effective date of said definition; * * *."

On July 20 the plaintiff's president protested that the provisions of the quoted article were unfair. On September 18, 1951, the Board's secretary sent the contract to the plaintiff for execution, and

wrote that "As of this date the * * * Board has not rendered a decision concerning General Order 71." That meant that although the plaintiff, in signing the contract, would be agreeing that the Board should have the power to make the onerous terms of General Order No. 71 retroactive, even back to January 1, 1947, the Board had not yet decided whether or not to exercise that power. The plaintiff was hopeful that the Board would not exercise the power.

Almost a year later, on September 17, 1952, the Board made its decision, making General Order No. 71 applicable to the plaintiff for the period January 1, 1947, to September 30, 1948, i. e., from the date of resumption of subsidy operations to the end of the plaintiff's ten-year recapture period under its original subsidy contract. It will be remembered that the comparable period for eight of the subsidized operators had been permitted to be governed by the net worth definition of General Order 31. The plaintiff's profits were recaptured on the basis of the retroactive application of General Order No. 71 to the period in question, and the plaintiff was obliged to pay back some $300,000 more than it would have had to pay if General Order No. 31 had been applied. The instant suit is for the amount of the allegedly excessive recapture, but the present phase of the suit concerns only the question of liability.

Our question is whether the retroactive application by the Maritime Board of the Maritime Commission's modified definition of "capital necessarily employed" was, in the circumstances recited above, illegal. The plaintiff says that it was illegal because it was discriminatory and was unreasonably retroactive.

 We think the Board's action with regard to the plaintiff was illegally discriminatory. A legislature, or an administrative agency authorized by the legislature to issue regulations having the force of law, may make classifications based upon rational differences in the situations of parties classified differently. In the instant case there were 12 operators which resumed subsidized operations on January 1, 1947. The Commission, and each of the operators, acted on the assumption that as soon as the complicated details of an appropriate subsidy contract could be worked out with each operator, a formal agreement would be made which would give that operator the benefits of having been a subsidized operator from January 1, 1947. The length of time necessary to work out the details of each operator's contract would depend upon the size and complexity and peculiar characteristics of the operation.

As we have seen, none of the operators were able to sign their completed contracts before the early part of 1950. The last of the eight operators which were given more advantageous treatment than the plaintiff was given, signed its contract on March 8, 1951. The plaintiff signed its contract on October 5, 1951. In the plaintiff's contract was the Article I-14(c) which gave the plaintiff's consent to the Board's power to later make General Order No. 71 effective retroactively, if the Board decided to do so. Except for this contractual provision, there was no difference between the plaintiff's situation and that of the eight operators who received different treatment. The Board in its explanation of its action, not taken until September 17, 1952, made no suggestion that there was any difference in shipping economics or practice, or route, financing, or operation, to justify its difference of treatment.

The Board's treatment of Moore-McCormack, narrated in finding 54, differently from the plaintiff, although all the relevant facts in the two situations were substantially the same, indicates confusion on the part of the Board.

A consideration of the conduct of the Board, in its entirety, persuades us that the pressure of the criticism by the House Committee and the General Accounting Office caused it to search out some situation in which it could make a gesture in the direction of yielding to its critics, without an obvious violation of rights. It justified its preferential treatment of the eight operators, not only on the ground that they had contract rights but, as the

Board said in its 1952 roll-back amendment, a roll-back as to the eight operators would be

"action in violation of the express Congressional intent that holders of operating subsidy contracts should thereby obtain 'a fair measure of stability' in the governmental policy as embodied in such contracts."

The plaintiff had, from January 1, 1947, been operating as a subsidized operator, recognized as such by the Commission and the Board, and complying with all the legal requirements laid down for such an operator. Yet not until September 17, 1952, did the Board determine what the plaintiff was entitled to, with regard to the vital provision of the statute relating to "capital necessarily employed", which would control the amount of the plaintiff's profits which the Government would be entitled to recapture.

We think that the Board's motive, of attempting to partially satisfy its critics by applying to the plaintiff and one other operator, Oceanic, a rule which it did not apply to any other ship operator, similarly situated, was not a legally permissible motive for official action. The administration of a statute cannot be carried on like horse-trading or haggling in a market place for private trading. What one can be induced to agree to, after he has become deeply involved with the Government by several years of action based upon reasonable assumptions, cannot impair his right under the statute to non-discriminatory treatment, and freedom from unreasonably retroactive treatment.

The administration of our maritime laws has been difficult, and conscientious administrators have been subject to criticism from within the Government, and to pressure from the industry. This court has had occasion to determine, in disregard of these criticisms and pressures, the rights of parties under these statutes and other applicable legal principles. We have held that one who has a right under a statute, or under a legal doctrine implicit in a statute, does not effectively surrender that right by making a contract about it. A. H. Bull

Steamship Company v. United States, 1952, 123 Ct.Cl. 520, 108 F.Supp. 95, and Southeastern Oil Florida, Inc. v. United States, 1953, 127 Ct.Cl. 409, 119 F.Supp. 731. Other cases in this court applying comparably relevant principles are Clapp v. United States, 1954, 127 Ct.Cl. 505, 117 F.Supp. 576 and Suwannee S. S. Corp. v. United States, Ct.Cl., 279 F.2d 874.

Our conclusion is that the combination, in the instant case, of unjustified discrimination and unreasonable retroactivity invalidated the Maritime Board's attempted roll-back of the effective date of the definition of "capital necessarily employed", embodied in General Order No. 71. The plaintiff is therefore, entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c), 28 U.S.C.A.

It is so ordered.

JONES, Chief Judge, and DURFEE, LARAMORE and WHITAKER, Judges, concur.