**AMERICAN PRESIDENT LINES, LTD.**

v.

**The UNITED STATES.**

**No. 561–84C.**

United States Claims Court.

April 23, 1986.

Timothy K. Shuba, Washington, D.C., for plaintiff.   Robert T. Basseches, of counsel.

Joseph T. Casey, Jr., Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant. Frank Ford, Maritime Admin., Dept. of Transp., of counsel.

## OPINION

YOCK, Judge.

This contract case comes before the Court in a suit arising out of two vessel trade-in agreements entered into between the plaintiff and the United States. The parties have cross-moved for summary judgment. After carefully reviewing all the evidence of record, it is the opinion of this Court that the plaintiff prevails on the merits of its liability argument but does not prevail on its argument for interest.

### Facts

The material facts are not in dispute.

The plaintiff, American President Lines, Ltd. ("APL"), is an operator of an ocean steamship service line. On November 21, 1978, the plaintiff submitted an application to the Assistant Secretary of Commerce for Maritime Affairs, to trade in certain obsolete vessels in exchange for an allowance of credit on the purchase and construction of a new MA Design C9–S–132a vessel, pursuant to authority contained in the Merchant Marine Act of 1936, as amended, (46 U.S.C. § 1101, *et seq.* (1982)). On April 30, 1979, based on the plaintiff's application, APL and the United States executed two trade-in agreements (with supplementary use agreements), Contract No. MA–9180/9181 and Contract No. MA–9227/9228.

Under section 510 of the Merchant Marine Act of 1936, as amended, 46 U.S.C. § 1160 (1982) ("section 510"), the United States Government is authorized to acquire obsolete vessels owned by private owners that are constructing new vessels in United States shipyards. Section 510(b) provides in pertinent part:

In order to promote the construction of new, safe, and efficient vessels to carry the domestic and foreign water-borne commerce of the United States, the Secretary of Transportation is authorized, subject to the provisions of this section, to acquire any obsolete vessel in exchange for an allowance of credit.

Owners are given trade-in credit allowances on obsolete vessels, based on fair and reasonable value as determined by the Secretary of Transportation.[1] If the United States acquires an obsolete vessel at the time the owner contracts for construction of its new vessel, the owner may continue to use the old vessel during the period of construction, with a reduction in the net trade-in allowance by an amount representing the fair value of such use. Vessels acquired by the United States under section 510 may become part of the United States' national defense reserve fleet for use in times of national emergency.

Section 510(d) establishes the criteria for setting trade-in allowances:

The allowance for an obsolete vessel shall be the fair and reasonable value of such vessel as determined by the Secretary of Transportation. In making such determination the Secretary of Transportation shall consider: (1) the scrap value of the obsolete vessel both in American and foreign markets, (2) the depreciated value based on a twenty or twenty-five year life, whichever is applicable to the obsolete vessel, and (3) the market value thereof for operation in the world trade or in the foreign or domestic trade of the United States. In the event the obsolete vessel is acquired by the Secretary of Transportation at the time the owner contracts for the construction of the new vessel, and the owner uses such vessel during the period of construction of the new vessel, the allowance shall be re-

---

1. Prior to August 6, 1981, the United States acted through the Secretary of Commerce, the Assistant Secretary of Commerce for Maritime Affairs and the Maritime Administration ("MarAd") in section 510 contract transactions. Effective August 6, 1981, MarAd was transferred to the Department of Transportation by operation of Pub.L. No. 97–31.

duced by an amount representing the fair value of such use.

46 U.S.C. § 1160(d) (1982).

Under APL's trade-in contracts, the United States acquired four obsolete vessels in exchange for an allowance of credit upon the purchase price of one new MA Design C9–S–132a vessel. The Government acquired the S.S. President Lincoln and the S.S. President Tyler under Contract No. MA–9180/9181, and the S.S. President Harrison and the S.S. President Monroe under Contract No. MA–9227/9228.

Title to APL's obsolete vessels passed to the United States concurrently with the delivery of a bill of sale for each vessel. The contracts also provided for the continued temporary use of the vessels until redelivery by APL and for a reduction of the trade-in allowance to compensate for such use. APL was to redeliver the vessels to the United States in good operating repair at the Suisun Bay National Defense Reserve Fleet Site, Benecia, California, following the period of use, after "deactivating" the vessel and performing the lay-up work necessary to prepare it for storage.

This repair and lay-up work was to be performed in accordance with the instructions prescribed in NSA Order No. 64 (3d Rev.). By the terms of the contracts, the United States was required to reimburse APL for one-half of the "fair and reasonable" costs incurred by APL in preparing the vessels for lay-up. APL performed all required repair and lay-up work for each of the traded-in vessels and completed redelivery.[2] MarAd determined that the "fair and reasonable" value of the lay-up work performed was $2,292,728.00 and reimbursed APL for one-half of that amount, or $1,146,364.00. In this action, neither party is contesting that the fair and reasonable value of the lay-up work performed was $2,292,728.00. The plaintiff, however, is contesting the right of the Government to charge the plaintiff 50 percent of the lay-up costs pursuant to MarAd's policy determination spelled out in its NSA Order No. 64 (3d Rev.) and made a part of the executed contracts.[3]

The dates of redelivery and amounts and dates of reimbursement of the four vessels were as follows:

| Vessel | Date of Redelivery | Lay up Cost | Date of Reimbursement | Reimbursement |
|---|---|---|---|---|
| Lincoln | 11/14/79 | $ 539,377.00 | 12/18/80 | $ 269,688.50 |
| Tyler | 10/11/79 | 552,564.00 | 12/18/80 | 276,282.00 |
| Monroe | 5/20/80 | 838,708.00 | 5/29/81 | 419,354.00 |
| Harrison | 1/29/82 | 362,079.00 | 6/27/83 | 181,039.50 |
| TOTALS | | $2,292,728.00 | | $1,146,364.00 |

The contracts to trade in the S.S. Presidents Lincoln, Tyler, Monroe and Harrison reflected the current MarAd policy in place at the time the contracts were executed requiring shipowners to bear 50 percent of the fair and reasonable lay-up costs incurred in the deactivation of a traded-in vessel. APL made no objection to these contract terms, but has alleged in this action that when it executed these contracts, it did so under the understanding that this was a standard requirement uniformly applied to all shipowners trading in obsolete vessels for credit under section 510. APL has also noted that no mention was made to it by MarAd of any possible or proposed

2. Since title had already passed to the Government, the vessels were considered "redelivered" to the Government when the Government actually took possession of the vessel at the reserve fleet site.

3. The costs of repairing the obsolete vessels to place them in good operating repair after redelivery is not at issue in this case. Only lay-up costs are at issue in this action, and this Court expresses no opinion as to the appropriateness of the United States in seeking reimbursement as to repairs from owners upon redelivery. *See generally Sea Land Service, Inc. v. United States,* 204 Ct.Cl. 57, 493 F.2d 1357 (1974).

modification of this policy, and that APL did not learn about a possible change from any other source.

In April 1981, APL learned through a conversation with the Government's contracting officer, Mr. Burt Kyle, (MarAd's Director of Ship Operations) that MarAd, in January 1980, had adopted a 100 percent reimbursement formula for lay-up costs. Thus, the former 50 percent reimbursement policy for lay-up costs was, after January 23, 1980, no longer operative. However, by this time, APL had redelivered the S.S. Presidents Lincoln, Tyler, and Monroe to MarAd, and MarAd had reimbursed APL 50 percent of the fair and reasonable lay-up costs incurred in connection with the S.S. Presidents Lincoln and Tyler. APL requested and received a copy of the final policy decision regarding the 100 percent lay-up costs change later in the month and was advised by the contracting officer that the new policy could not be applied to APL's trade-in contracts because they predated the change in policy. APL did not know at this time when the policy had become effective. The following month, in May 1981, APL received the 50 percent reimbursement of lay-up costs for the S.S. President Monroe. In November 1981, APL prepared to redeliver the S.S. President Harrison and requested full reimbursement for lay-up costs. Again, MarAd informed APL that the 100 percent reimbursement policy was inapplicable under the terms of its April 30, 1979 contracts. APL then accepted 50 percent lay-up reimbursement on the S.S. President Harrison, but reserved its right to claim entitlement to the full 100 percent. APL subsequently learned that a proposal for a change in the lay-up reimbursement policy had been under consideration by MarAd staff members in early April 1979 (before APL's trade-in and use agreement contracts had been executed). APL also learned that the lay-up reimbursement policy change had not been formally approved by MarAd until January 23, 1980, when the Assistant Secretary of Commerce for Maritime Affairs signed off on the policy change.

The first written proposal within MarAd suggesting the reimbursement policy change occurred on April 11, 1979. At that time, Mr. Kyle submitted a memorandum to the maritime division of the Office of General Counsel recommending reconsideration and review of the repair cost standards imposed on the shipowners when trading in obsolete vessels as well as the 50 percent lay-up costs imposed on the owners. That April 11, 1979 memorandum reads in pertinent part:

An additional problem area is in the present contract arrangements which require that MarAd and the steamship company share the cost of lay up work. Inflation and the size of the ships we are beginning to encounter for lay up have sharply increased the cost in accordance with the standards prescribed by MarAd's NSA Order No. 64. This is particularly true as the ships are being depreciated from their original dollar price on a 20–25 year basis toward an ultimate price calculated for scrap steel conditions. While the scrap price, being subject to world market conditions and not escalation, is relatively static, the cost of repairs and lay up, etc., demanded by NSA Order No. 64 have sharply increased due to inflationary factors. Sometimes this results in the cost of NSA work plus repairs, etc., reaching or exceeding the value of the traded in ship as established by MarAd's Ship Valuation Committee. This results in a "sour deal" when the shipowner nets less from the translation [sic: transaction] than what he could have received from selling his ship on the scrap market. I propose that the use agreement contract be modified in that the sharing of the cost of lay up be eliminated and that MarAd assume all of these costs. This will eliminate an area of dispute and will also present MarAd with an incentive to decrease the cost of items going into the lay up phase.

This proposal was then incorporated into a memorandum to the Assistant Secretary of Commerce for Maritime Affairs. Between April 11, 1979 and December 3, 1979, there followed a series of memorandums back

and forth between various MarAd officials commenting pro and con on the initial proposal. Finally, on December 3, 1979, MarAd's Assistant Administrator for Shipbuilding and Ship Operations put forward the distilled memorandum that eventually (on January 23, 1980) was approved by the Assistant Secretary of Commerce for Maritime Affairs. Included within that memorandum was the approval and authority to change MarAd's previous 50 percent reimbursement policy for lay-up expenses to the new 100 percent reimbursement lay-up policy.

On December 17, 1979, another shipping company, Farrell Lines, Inc. ("Farrell"), and the United States entered into Contract No. MA–9468/9469 in which the United States acquired eight obsolete vessels owned by Farrell in a section 510 trade-in. The Farrell contract provided for 100 percent reimbursement to Farrell of the lay-up costs incurred in the deactivation of the ships, even though the lay-up policy change had not been formally approved by December 17, 1979.

On February 18, 1983, APL submitted to the contracting officer its formal claim for the 50 percent lay-up costs it incurred in preparing the S.S. Presidents Lincoln, Tyler, Monroe and Harrison for redelivery and entry into the national reserve fleet. On November 4, 1983, the Maritime Administration issued its final decision denying APL's claim for full reimbursement. This action followed.

### Discussion

Based on the material undisputed facts, the parties have cross-moved for summary judgment.

The plaintiff believes it is entitled to summary judgment as a matter of law in this case for three reasons. First, it argues that MarAd's refusal to reimburse APL fully for the lay-up costs incurred in connection with the subject trade-ins violates section 510(d) of the Merchant Marine Act of 1936, as amended, 46 U.S.C. § 1160(d), by substantially reducing the net trade-in allowance received by APL below that mandated by section 510(d). Second, it asserts that MarAd's failure to disclose the lay-up policy change to APL, in the context of their contract negotiations, violated the Government's obligation to disclose to its contractors all material information known to the Government but not known to the contractor. Third, the plaintiff contends that MarAd violated its obligation to treat its contractors fairly and equally by giving another shipowner, Farrell Lines, Inc., the benefit of the new policy even though it, like APL, executed its contract before the new policy was finally adopted by MarAd, and because performance under the two sets of contracts substantially overlapped.

The defendant counters plaintiff's assertions and demands summary judgment as a matter of law by arguing that: (1) MarAd's established policy that shipowners bear the burden of fifty percent of lay-up costs incurred in connection with trade-ins was a reasonable exercise of its discretionary authority contained in the Merchant Marine Act of 1936, as amended, and did not unreasonably lower the value of APL's trade-in allowance mandated under section 510(d) of the Act; (2) MarAd had no affirmative obligation to disclose to APL consideration by MarAd staff members of a change in policy regarding the treatment of lay-up cost; and (3) there was no discrimination against APL in Farrell's favor because, at the time the Farrell contracts were concluded, formal approval of the lay-up policy change was about to be executed and was anticipated in the contracts.

As earlier indicated, the Court concludes that the plaintiff prevails on the liability issue.

### I. Authority/Discretion Issue

In its opening brief, the plaintiff has stated the primary issue in this case as follows:

Where Congress by statute fixes the factors that the government is to consider and include in establishing trade-in allowances on vessels traded-in to the government by private shipowners, may the government by contract impose an additional factor that substantially re-

duces the net trade-in allowance actually received below that required by the express terms of the statute?

The plaintiff goes on to point out that:

MarAd's requirement that APL bear 50 percent of the costs associated with laying up the traded-in vessels in the United States' Reserve Fleet is flatly inconsistent with the governing statute, and therefore unlawful. Section 510(d) of the 1936 Merchant Marine Act, 46 U.S.C. § 1160(d), by its plain terms requires that trade-in allowances "shall be" based on consideration of three criteria: the "scrap value" of the traded-in vessel, the vessel's "depreciated value," and the vessel's "market value * * * for operation" in the world or U.S. foreign or domestic trade. From this defined valuation the statute provides that there "shall be" a single deduction: a sum for charter hire if the former owner continues to use the vessel following trade-in. The statute makes no provision whatever for reduction of a shipowner's trade-in allowance by any portion of the United States' layup costs.

Thus, the plaintiff concluded that MarAd's imposition of lay-up costs incurred by APL solely for the convenience of the Government substantially reduced the net trade-in allowance APL received below the net allowance that was required by the express terms of section 510(d), and was, therefore, impermissible and unlawful.

The Court agrees with the plaintiff's statement of the issue and with its argument.

■ Stated another way, the primary issue here is whether or not the Maritime Administration had the discretionary authority, under the Merchant Marine Act of 1936, as amended, to impose a 50 percent lay-up reimbursement requirement upon APL in its trade-in and use contracts. Whenever administrative action exceeds the authority delegated to it by Congress, it is appropriate for an aggrieved party to obtain judicial relief from the enforcement of such excess. See *Stark v. Wickard*, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944);

*Social Security Board v. Nierotko*, 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1946). The Government, of course, cannot do by contract what it lacks authority to do by statute. *Oceanic S.S. Co. v. United States*, 218 Ct.Cl. 87, 139–40, 586 F.2d 774, 804 (1978); *American President Lines, Ltd. v. United States*, 154 Ct.Cl. 695, 291 F.2d 931 (1961); *Suwannee S.S. Co. v. United States*, 150 Ct.Cl. 331, 279 F.2d 874 (1960).

The issue here boils down very quickly to one of statutory construction:

In determining the meaning of a statute, the first inquiry must be directed to the statute's language. If the language is plain, the duty of interpretation does not arise and the function of the courts is limited to enforcing the statute according to its own terms. *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). 2A Sands, *Sutherland Statutory Construction*, § 46.01 (4th ed.). When a statute is plain and unequivocal on its face, there is no need to resort to legislative history. *United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575 (1961). However, when enforcement of the literal interpretation of a statute leads to "absurd" results such that a literal view would impute to Congress an irrational purpose, *United States v. Bryan*, 339 U.S. 323, 338, 70 S.Ct. 724, 734, 94 L.Ed. 884 (1950), or would thwart the obvious purposes of the statute, *In Re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978), or would lead to an "unreasonable" result plainly at variance with the policy of the legislation as a whole, *Trustee of Indiana University v. United States*, 223 Ct.Cl. 88, 94, 618 F.2d 736, 739 (1980), literal interpretation will be eschewed in favor of a more flexible inquiry into legislative intent. 2A Sands, *Sutherland Statutory Construction*, § 46.07. Thus, if a statute's text is unclear or ambiguous and its words do not readily provide a plain meaning, a literal approach is unhelpful and it is appropri-

ate to resort to legislative history. *United States v. Oregon*, 366 U.S. at 648, 81 S.Ct. at 1281; *Fitzpatrick v. Internal Revenue Service*, 665 F.2d 327, 329–30 (11th Cir.1982).

*Texas State Comm'n for the Blind v. United States*, 6 Cl.Ct. 730, 738 (1984).

■ The Supreme Court has recently provided federal courts with the guidelines to use in cases, such as here, when the statute is silent as to the precise matter at issue. The Court stated:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

"The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a stat-

utory provision for a reasonable interpretation made by the administrator of an agency.

We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations "has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.

"... If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984) (footnotes and citations omitted). The judiciary is, of course, the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. *See, e.g., FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981); *SEC v. Sloan*, 436 U.S. 103, 117–18, 98 S.Ct. 1702, 1711–12, 56 L.Ed.2d 148 (1978); *FMC v. Seatrain Lines, Inc.*, 411 U.S. 726, 745–46, 93 S.Ct. 1773, 1784–85, 36 L.Ed.2d 620 (1973); *Volkswagenwerk v. FMC*, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968); *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965); *Social Security Board v. Nierotko*, 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946); *Burnet v. Chicago Portrait Co.*, 285 U.S. 1, 16, 52 S.Ct. 275, 281, 76 L.Ed. 587 (1932); *Webster v. Luther*, 163

**8**

U.S. 331, 342, 16 S.Ct. 963, 967, 41 L.Ed. 179 (1896).

With the above guidelines in mind, it is necessary to look first at the starting point, which is the language of the statute. *Freese v. United States*, 6 Cl.Ct. 1, 17 (1984), *aff'd*, 770 F.2d 177 (Fed.Cir.1985). In the interpretation of a statute, the language of that statute is the best indication of the intent of Congress. *Lykes Bros. S.S. Co. v. United States*, 206 Ct.Cl. 354, 513 F.2d 1342 (1975); *Carrier Corp. v. United States*, 208 Ct.Cl. 678, 534 F.2d 244 (1976); *Texas State Comm'n for the Blind v. United States*, 6 Cl.Ct. 730 (1984). Section 510(b) and (d) of the Merchant Marine Act of 1936, as amended, provide in pertinent part:

In order to promote the construction of new, safe, and efficient vessels to carry the domestic and foreign waterborne commerce of the United States, the Secretary of Transportation is authorized, subject to the provisions of this section, to acquire any obsolete vessel in exchange for an allowance of credit. * * *

\* \* \* \* \* \*

The allowance for an obsolete vessel shall be the fair and reasonable value of such vessel as determined by the Secretary of Transportation. In making such determination the Secretary of Transportation shall consider: (1) the scrap value of the obsolete vessel both in American and foreign markets, (2) the depreciated value based on a twenty or twenty-five year life, whichever is applicable to the obsolete vessel, and (3) the market value thereof for operation in the world trade or in the foreign or domestic trade of the United States. In the event the obsolete vessel is acquired by the Secretary of Transportation at the time the owner contracts for the construction of the new vessel, and the owner uses such vessel during the period of construction of the new vessel, the allowance shall be reduced by an amount representing the fair value of such use. The rate for the use of the obsolete vessel shall be fixed by the Secretary of Transportation for the entire period of such use at the time of execution of the contract for the construction of the new vessel.

46 U.S.C. §§ 1160(b), (d) (1982).

Examination of the statute shows that the treatment of lay-up costs was not addressed in sections 510(b) and (d). These costs, however, are addressed, along with the separated issue of trade-in and use agreement value computation, in the contracts and use agreements between APL and the United States. The pertinent provisions of Contract No. MA–9180 and the accompanying Use Agreement Contract No. MA–9181 are:

[*Contract No. MA–9180*]

ARTICLE 3. *Trade-in Allowances for Obsolete Vessels.*

(a) Subject to the condition that the Company shall have contracted for the construction of the new vessel, as provided in ARTICLE 2 above, the Government grants to the Company the following allowances of credit (herein called the "trade-in allowances"), pursuant to the provisions of Section 510(d) of the Act, for the obsolete vessels, determined as follows:

| Vessel | Gross Trade-in Allowance |
|---|---|
| PRESIDENT LINCOLN | $2,960,000.00 |
| PRESIDENT TYLER | 2,960,000.00 |
| TOTAL | $5,920,000.00 |

\* \* \* \* \* \*

(b) As of the date hereof, the obsolete vessels having been and currently being in layup, the Company and the Government have entered into a Use Agreement, Contract No. MA–9181 (herein called the "Use Agreement") providing for the use of the obsolete vessels by the Company during the accomplishment of all delivery obligations under this Contract. The trade-in allowance for each obsolete vessel shall be reduced by an amount computed at the rate and in accordance with the provisions of the Use Agreement.

(c) The trade-in allowances specified in paragraph (a) of this ARTICLE 3 less such reductions as may be required by this Contract (herein called the "net trade-in allowances") shall be paid by the Government to the Shipbuilder.

ARTICLE 4. *Payment on Account of the Net Trade-in Allowances.*

(a) Pending a determination of the actual use period and the amounts required by this Contract to be deducted from the trade-in allowances, the Assistant Secretary has determined the estimated charter hire during the use period and the estimated net trade-in allowances as follows:

| Vessel | Trade-in Allowance | Estimated Charter Hire During Use Period | Estimated Net Trade-in Allowance |
|---|---|---|---|
| PRESIDENT LINCOLN | $2,960,000.00 | $ 6,750.00 | $2,953,250.00 |
| PRESIDENT TYLER | $2,960,000.00 | $ 6,750.00 | $2,953,250.00 |
| TOTALS | $5,920,000.00 | $13,500.00 | $5,906,500.00 |

\* \* \* \* \* \*

ARTICLE 6. *Delivery of the Obsolete Vessels to the Government.*

\* \* \* \* \* \*

(b)(2) \* \* \* the Company shall perform such work as may be required in connection with the preparation for layup and movement of the obsolete vessels to the Suisun Bay Reserve Fleet Site, as prescribed in Clause 13(d), Part II, of the Use Agreement.

\* \* \* \* \* \*

ARTICLE 12. *Title to Obsolete Vessels.*

(a) Title to each obsolete vessel shall pass to the Government concurrently with the delivery of a Bill of Sale for such vessel in the form attached hereto as Exhibit 1, simultaneously herewith and effective as of the day and hour thereof. Thereafter, the Government shall be the owner of such vessel, but the vessel shall not be deemed to be operated by or for the Government for any purpose.

[*Use Agreement Contract No. MA–9181* ]

**Part II**

\* \* \* \* \* \*

CLAUSE 13. *Redelivery of Vessels.*

\* \* \* \* \* \*

(d) *Vessel layup.*

(1) Unless otherwise instructed by the Owner, the Charterer shall perform all work required in connection with the preparation for layup and movement of the Vessels to the Suisun Bay National Defense Reserve Fleet Site, as provided in paragraph (a) of this Clause. The deactivation and preparation of the Vessel for layup shall, unless otherwise directed by the Contracting Officer, be performed in accordance with the Layup Instructions prescribed in NSA Order No. 64 (3d Rev.) (herein called the "Layup Instructions"), attached to this Agreement \* \* \*. The Owner agrees to reimburse the Charterer: (a) the fair and reasonable costs, as determined by the Owner, of towing the Vessel from the port of San Francisco to said Reserve Fleet Site, and (b) *fifty percent (50%) of the fair and reasonable costs, as determined by the Owner, of performing the work not otherwise encompassed by the provisions of this Agreement but solely required in connection with the preparation of the Vessel for layup pursuant to this subparagraph (1).* [Emphasis supplied.]

(These provisions are also representative of Contract No. MA–9227 and the accompany-

ing Use Agreement Contract No. MA–9228, involving the trade-ins of the S.S. President Monroe and the S.S. President Harrison.)

What is clear from a reading of the statute is that lay-up costs *per se* were not addressed. Congress, when it enacted section 510(d) of the Act in 1939, simply did not write in that factor to be taken into account by MarAd, either when MarAd initially determined what the fair and reasonable value of the obsolete vessel to be traded in was, or to be considered as an offset to the fair and reasonable value after the period of use. Congress was, however, rather specific in terms of the factors that could be used by MarAd in determining fair and reasonable value. It used the mandatory "shall" language to direct the Secretary of Commerce (now Transportation) to consider three factors: (1) scrap value; (2) depreciation value; and (3) market value. It clearly did not provide a fourth factor to consider—*i.e.*, lay-up costs. Moreover, when considering what reductions to the fair and reasonable valuation MarAd could allow, Congress only authorized one—*i.e.*, a reduction for continued use until redelivery. Again, nowhere to be found in the statute is a congressional direction to allow reductions or offsets for lay-up expenses.

The plaintiff argues that this congressional silence was intended, and it points to the contemporaneous legislative history to support its argument. *See generally* H.Doc. No. 208, 76th Cong., 1st Sess. 5–7 (1939) (transmitting proposed section 510 to Congress); Hearings, *supra*, at 1–2; H.R. Rep. No. 824, 76th Cong., 1st Sess. 5–8 (1939); S.Rep. No. 724, 76th Cong., 1st Sess. 7–10 (1939). Specifically, plaintiff points to a statement made by the Chairman of the House Committee that held hearings on the proposed section 510 in 1939. The Chairman explained:

> The allowance suggested by the Commission and stated in the bill would be the fair and reasonable value of the old vessel, as determined by the Commission after consideration of the following factors: (1) The scrap value of the obsolete vessel both in American and in for-

eign markets; (2) the depreciated value based on a 20-year life; and (3) the market value thereof for operation in the world trade, or in the foreign or domestic trade of the United States.

> The Commission, after consideration of the age of the vessel, its physical condition, and world and United States market conditions, would assign whichever value it found to be most appropriate to the circumstances, *limited however to the categories specified in the bill.*

Hearings, *supra*, at 2 [emphasis added].

In addition to the above statement, the plaintiff contends that the whole tenor of the legislative history, as it pertains to the section 510 proposal in 1939, was to the effect that the Government should provide the shipowner the same trade-in value that he could obtain on an open free world market. Since war clouds were forming in 1939, Congress wanted to contain a shipper's right to sell scrap iron or obsolete ships to certain potential enemy nations, so it devised the subsidy/credit program to encourage the shippers to construct new ships and receive an approximately similar open market price. The lay-up reimbursement requirement, however, reduces the net allowance received by a shipowner not because of ordinary commercial market conditions, but because of the unique requirements imposed by the Government's addition of these vessels to the reserve fleet.

The defendant counters the plaintiff's arguments in this regard with basically two points. First, it alleges that far from the statute being silent, the statute actually allows wide discretion on the part of the Secretary to consider whatever factors it must to arrive at a fair and reasonable trade-in credit. It concedes that the Secretary must consider scrap, depreciation, and market values as a part of the process, but it is not limited to considering only those factors. As long as the Secretary's end result is a fair and reasonable trade-in credit, that is all the statute requires, according to the Government.

Unfortunately for the defendant, however, the Court does not agree with its argument. When Congress sets out limiting factors in a statute, this Court believes that Congress intended those factors to be observed. If Congress intended more factors to be considered, it could have written these in. It did not. Moreover, if Congress really intended MarAd to have a carte blanche as to what amounts to a fair and reasonable credit, it could have very simply not included any mandated factors in the statute to be considered. It could have left the entire matter up to MarAd in its discretion. But it did not do this. Congress gave some rather specific directions as to what factors can be considered. MarAd is not free to ignore these limiting factors nor, under the circumstances, may it add factors at its discretion. This Court believes that the defendant's arguments regarding MarAd's discretion go far beyond what Congress intended or would condone. *Chevron, supra*, 487 U.S. at 844–45, 104 S.Ct. at 2782–83.

Next, the defendant argues that the continuing legislative history of section 510(d) of the Act from 1939 to 1980 shows that Congress was aware of MarAd's policy of charging the shippers for 50 percent of the lay-up costs, and did not change the law. In other words, the Congress ratified, through legislative inaction, the MarAd 50 percent lay-up reimbursement policy because it was aware of the policy and did not do anything about it.

In support of this argument, the defendant points to congressional testimony elicited in 1965 in regard to section 510(d) of the Act. In opposing an amendment to section 510(d) that would require the Government to bear the entire lay-up costs, the then Maritime Administrator, Mr. Nicholas Johnson, testified that the policy of the agency was to require owner contributions for vessel deactivation costs that exceeded $15,000. *Vessel Exchange Authority Extension: Hearings Before the Subcomm. on Merchant Marine of the House Comm. on Merchant Marine and Fisheries*, 89th Cong., 1st Sess. 72 (1965). He testified:

The remaining amendment of section 510(d) that the new section would make is to require that the United States bear the entire cost of deactivation and preparation of the traded-in vessel and its equipment for storage or layup and of delivery of the vessel and its equipment to the location designated by the Secretary.

Our policy since 1960 has been to pay all of these costs, except that with regard to deactivation costs our policy has been to pay only the first $15,000 of such costs and one-half of such costs in excess of $15,000. At the time this policy was established in 1960, the normal costs of deactivation were about $15,000. The deactivation of the ship is under the control of the subsidized operator. It is accomplished by the subsidized operator's employees or under a contract entered into by the subsidized operator. We reimburse the subsidized operator within the limits of our policy. The purpose of our policy is to induce the sub-amount of money involved for any subsidized operator in paying one-half of the deactivation costs over $15,000 is not large [sic].

For the foregoing reasons we are opposed to the amendment proposed by the Committee on American Steamship Lines.

\* \* \* \* \* \*

Mr. ASHLEY. Thank you, Mr. Johnson. There certainly cannot be any question as to the position of the administration with respect to the proposed amendments.

In subsequent testimony, the following exchange took place between the Administrator and Congressmen Mailliard and Ashley of the Subcommittee on Merchant Marine:

Mr. MAILLIARD. You mentioned your policy to pay the first $15,000 of the activation [sic: deactivation] costs. What does it run on an average?

Mr. JOHNSON. As I indicated, Mr. Mailliard, at the time this policy was announced, it ran about $15,000 so at

that time we were paying the entire cost. The purpose of the policy then was simply to provide some incentive for the company to hold down what are, after all, payments to the company.

Mr. MAILLIARD. I understand the policy and I think it makes a certain amount of sense. I was wondering whether perhaps that figure has not become somewhat outdated, and perhaps whether your assumption of the cost should be up to what you consider to be a proper amount; $15,000 may have been the proper amount some 5 years ago. I suspect it is on the rather low side now.

Mr. JOHNSON. The figure now sometimes runs as high as $20,000 per ship and with the Maritime Administration picking up half of that this means the companies are spending on the order of $2,500 per ship for deactivation costs of $20,000, slightly in excess of 10 percent of the total cost.

\* \* \* \* \* \*

That, Mr. Chairman, is what we are doing. I think it is useful to consider this issue in the context in which it finds itself.

Mr. MAILLIARD. I got a rather long answer to a short question.

Mr. ASHLEY. $2,500 is involved.

Mr. MAILLIARD. I was not trying to nit pick. I was suggesting that if the policy adopted in 1960 was equitable in 1960 it might be somewhat less equitable now than it was then. Obviously there has been some increase in prices. If you read the transcript of last week's hearings I suggested then, and I still believe that we should not legislate in such detail. I think the hearing is useful. It discussed the administrative policies that are being followed.

I, for one, do not believe we ought to try to run your business by statute to that extent.

*Id.* at 80–82.

From the testimony, the defendant asserts that it was clear that the Congress knew of MarAd's lay-up policy, agreed with it, and thus ratified the policy.

Although it is quite true that Congress, in 1965, was aware of MarAd's lay-up reimbursement policy as it existed in 1965, it is also quite true that the "policy" within MarAd changed dramatically between 1965 and 1979, both as to costs and content. Whereas in 1965, the average lay-up reimbursement from the shippers was a *de minimis* $2,500, by the time 1979 rolled around, lay-up reimbursements were running in excess of $300,000 per ship. Also, the initial $15,000 lay-up expense that was assumed by the Government was out the window in favor of a strict 50 percent lay-up sharing arrangement. How prophetic Congressman Mailliard was when he noted that the lay-up policy may have been equitable in 1965 when each owner had to reimburse an average of $2,500 per ship, but may not be equitable when prices had increased considerably. Although Mr. Mailliard, for one, was willing to give some discretionary leeway to MarAd in administering section 510(d) in regard to lay-up costs in 1965, the Court doubts whether he or Congress would be willing to give the carte blanche discretionary call that the defendant argues for now. The magnitude of MarAd's lay-up reimbursement policy as applied in the 1970's was never brought home to Congress sufficiently for this Court to find the necessary ratification.

There is one other matter that should be mentioned. Section 510(i) of the Act, 46 U.S.C. § 1160(i), demonstrates that Congress knew well how to provide for the treatment of lay-up costs when it intended for such costs to be taken into account. Section 510(i), the so-called "trade-in, trade-out" provision, was first added to section 510 in 1960, Pub.L. No. 86–575, 74 Stat. 312, and provided that trade-in values under section 510(i) were to be based on the valuation criteria contained in section 510(d). The Commerce Department proposed that section 510(i) requires the owner of the traded-in vessel, at his own expense, to "effect de-activation and preparation of the traded-in vessel \* \* \* for storage or layup." The Commerce Department included this provision to fully protect the

interest of the United States. Hearings Before the Subcomm. on Merchant Marine of the House Merchant Marine and Fisheries Comm. on H.R. 8890, 86th Cong., 2d Sess. 5 (1960) (letter of Philip A. Ray, Under Secretary of Commerce). The House Committee, however, viewed the Commerce Department's plan to impose lay-up costs as inconsistent with the purpose of the section 510(d) criteria. The Committee explained:

> This cost might be burdensome and discourage exchanges, and it is fair that this expense should be given reasonable consideration so as to maintain insofar as possible the strict commercial nature of the exchange and thus not impose onerous conditions on the owner of the traded-in vessels.

H.R.Rep. No. 1652, 86th Cong., 2d Sess. 2 (1960), U.S.Code Cong. & Admin.News 1960, pp. 2646, 2646. The Committee, therefore, offset the costs of lay-up that would be imposed by the Commerce Department's proposal by adding to section 510(i) a provision specifically authorizing the Secretary of Commerce to take those lay-up costs into account in determining the value of the traded-in vessel. The Committee's addition was enacted. Pub.L. No. 86–575, 74 Stat. 312 (1960). Thus, Congress explicitly affirmed that, absent an allowance adjustment, imposing lay-up costs on shipowners was inconsistent with the standards of section 510(d).[4]

In summary then, MarAd simply went beyond its statutory authority. Congress put limits upon MarAd's discretionary authority and MarAd exceeded those limits. Furthermore, Congress did not ratify the lay-up policy by its limited knowledge and legislative inactivity. Since the Government has no right to contract on matters on which it lacks statutory authority, it is appropriate for this Court to order a reformation of the contract at issue. Based on the above discussion, the plaintiff is entitled to recover in damages, the amount of $1,146,364, which represents the 50 percent lay-up reimbursement the Government impermissibly collected from it under the contracts at issue.

## II. Superior Knowledge/Discrimination Issues

In view of the discussion and case decisions in section I of this opinion, the Court need not spend a great amount of time dealing with the plaintiff's superior knowledge and discrimination arguments. Nevertheless, perhaps some thoughts should be expressed in the interests of being complete.

Plaintiff's superior knowledge argument is based on the premise that the Government, when negotiating a contract with a party, owes that party a duty to disclose all relevant facts that would be necessary to know in order to be able to carry out all the obligations to be incurred under the contract. The plaintiff maintains that the Government should have advised it, prior to contract execution, that the 50 percent lay-up reimbursement policy was under review and could be changed to a 100 percent reimbursement policy.

The Court does not agree with this argument because at the time the contracts were executed (April 30, 1979), the lay-up reimbursement review was simply a proposal. The proposal was first articulated in a memorandum written to the office of general counsel and authored by Mr. Kyle on April 11, 1979. By its very nature, the memorandum called for future discussion and thought. There was, in fact, many subsequent memorandums authored by various MarAd staff persons expressing their views on the initial proposal pro and con. Not until December 3, 1979, was the proposal finalized and ready for authorized signature—some seven months after APL and the Government entered into its trade-

---

4. Although the original vessel exchange provision of section 510(i) discussed in text expired on July 5, 1972, the current section 510(i), applicable to trade-in of Mariner Class vessels, was added in 1975. Pub.L. No. 93–605, 88 Stat. 1965 (1975). Congress explicitly provided in the new section 510(i) that lay-up costs incurred in connection with the Mariner trade-ins would be paid in full by the United States. 46 U.S.C. § 1160(i) (1982).

in and use agreements. This Court does not believe that the Government, under these circumstances, is under any duty to disclose a potential policy change which may or may not be subsequently adopted. The Government does not have to disclose every idea/proposal that is currently circulating, when it goes forward and contracts based on what it believes to be valid statutory and regulatory authority. The holdings in the cases of *Oceanic S.S. Co. v. United States*, 218 Ct.Cl. 87, 119–21, 586 F.2d 774, 792–93 (1978); *Hardeman-Monier-Hutcherson v. United States*, 198 Ct.Cl. 472, 486–88, 458 F.2d 1364, 1371–72 (1972); *Moore-McCormack Lines, Inc. v. United States*, 188 Ct.Cl. 644, 413 F.2d 568 (1969); and *Helene Curtis Indus., Inc. v. United States*, 160 Ct.Cl. 437, 443, 312 F.2d 774, 777 (1963), are simply not for application to the facts presented in this case.

Likewise, the plaintiff does not prevail with this Court on its arguments based on discrimination. The plaintiff here contends that the Government unlawfully discriminated against APL when it allowed another competitor (Farrell Lines, Inc.) to have the full benefits of the 100 percent lay-up reimbursement policy, even though the policy was not yet formally approved by the Assistant Secretary of Commerce for Maritime Affairs. The Assistant Secretary formally approved the 100 percent lay-up policy on January 23, 1980. The Farrell Lines contract was executed on December 17, 1979.

■ The fact that the Government may have mistakenly or inappropriately applied a policy, not yet formally authorized, to another shipping company, does not mean that the same mistake or inappropriate application has to be applied to the plaintiff. Although the Court does not have to decide whether or not there was a mistake with regard to the Farrell matter, it is clear that there was a significant time difference. APL's contracts were executed on April 30, 1979, whereas the Farrell contract was executed on December 17, 1979—some seven months later, and within one month of the date that the new policy was formally approved. If there was a mistake, that mistake impacted on Farrell—not APL. Plaintiff gains nothing by this argument.

### III.  Interest/CDA Issue

Finally, since the Court has found that the plaintiff prevails, based on its statutory authority argument, and is entitled to recover the lay-up contribution it made, the Court must now decide whether the plaintiff is entitled to interest on its recovery. Plaintiff invoked section 12 of the Contract Disputes Act of 1978 (41 U.S.C. § 611 (1982)) (CDA) as its authority for claiming interest herein. If the plaintiff is correct that this is the type of contract that falls within the ambit of the CDA, it then would be entitled to interest herein.[5]  Although this is a close and troublesome question, this Court does not believe that this is the type of contract that comes within the ambit of the CDA.

Trade-in and use contracts are authorized by the Merchant Marine Act of 1936, as amended. It is clear from the legislative history that the section 510 trade-in provisions were added to the Act to encourage badly needed construction of new American merchant vessels. *See generally* S.Rep. No. 724, 76th Cong., 1st Sess. (1939); Maritime Commission's Recommendations for Legislation, H.Doc. No. 208, 76th Cong., 1st Sess. (1939); President's Message to Congress Transmitting Views and Two Reports on Subject of Adequate Merchant Marine, H.Doc. No. 118, 74th Cong., 1st Sess. 1 (1935).

The House Committee on Merchant Marine and Fisheries, reporting on a proposed trade-in provision amendment to the Act in 1939, noted that of 153 vessels in the United States' subsidized fleet, 133 would have been 20 years old by 1942, and their replacement "would fall far short of national defense requirements." H.R.Rep. No. 824,

---

5. If this is not a CDA case, then the plaintiff could only recover interest under the provision of the contract itself, and the contracts at issue here do not provide for any interest payments. *See* 28 U.S.C. § 2516(a) (1982).

76th Cong., 1st Sess. 5 (1939). Under section 9 of the Shipping Act of 1916, 46 U.S.C. § 808, the United States generally prohibited, as a matter of public policy, the sale of U.S. flag vessels to foreign interests for operation or for scrap. However, domestic prices for the vessels were generally lower than foreign prices in the late 1930's. The market restrictions on sales, unfortunately, kept old vessels in operation which would otherwise have been sold in the world market, and resulted in a domestic fleet "consisting preponderantly of antiquated vessels." H.R.Rep. No. 824, 76th Cong., 1st Sess. 5 (1939). In 1936, Congress directed the Maritime Commission to study the problem of removing obsolete tonnage from operation in the United States Merchant Marine fleet. The Maritime Commission presented section 510 as a legislative proposal to Congress in 1939. This section provides that shipowners may trade in their obsolete vessels to the United States for "the fair and reasonable value of such vessel." Section 510(d), 46 U.S.C. § 1160(d). The value obtained is then channeled by the United States into credit for new ship construction.

In addition to the trade-in provisions, the Merchant Marine Act of 1936, as amended, also provided subsidy support for American shipbuilding.[6] Title V of the Merchant Marine Act, 46 U.S.C. §§ 1151, *et seq.*, authorizes United States citizens or shipyards to apply to the Secretary of Transportation for construction-differential subsidies; these subsidies promote the construction of new vessels to be used in the foreign commerce of the United States. Similar subsidies for operation of vessels in U.S./foreign commerce are also provided. The subsidy programs are intended to make up the gap between American and foreign shipping costs. Furthermore, although subsidy and trade-in provisions appear in separate sections of the Merchant Marine Act, and although the trade-in provisions were not intended to contain any "element of subsidy" H.R.Rep. No. 824, 76th Cong., 1st Sess. 2 (1939), the two are in fact closely interrelated. For example, the Court of Claims, in describing the workings of an operating-differential contract, noted that: "In order to guarantee the replacement of obsolete vessels and further stimulate construction in American shipyards, the operating contracts set out for each operator, a schedule of new vessel construction." *Moore-McCormack Lines, Inc. v. United States*, 188 Ct.Cl. 644, 650, 413 F.2d 568, 571 (1969). APL operates ocean steamship services under such an operating-differential subsidy contract with defendant entered into pursuant to Title VI of the Merchant Marine Act of 1936, as amended, 46 U.S.C. § 1171, *et seq.* In comparison, section 510(d) trade-ins provide a similar incentive for new ship construction, but instead of penalizing the failure to modernize by subsidy cancellation (as in the case of an operating-differential contract), section 510(d) provides a positive incentive in the form of a credit towards new ship construction when old ships are traded in. Regardless of the method used, however, the ultimate goal in both cases is a modernized fleet.

■ With the above-discussed background of the section 510(d) trade-in program in mind, this Court can now turn to the issue of whether or not this is the type of contract that Congress had in mind to bring within the ambit of the Contract Disputes Act. This Court holds that it is not. These contracts are not the type of conventional contracts for direct procurement by the Government of tangible property or services that Congress contemplated including within the scope of the Contract Disputes Act. Specifically, 41 U.S.C. § 602(a) provides that the applicability of the Act is limited to:

6. United States Court of Claims cases have extensively discussed the history of the merchant ship subsidy system. *See Oceanic S.S. Co. v. United States*, 218 Ct.Cl. 87, 93–94, 586 F.2d 774, 777 (1978); *Moore-McCormack Lines, Inc. v. United States*, 188 Ct.Cl. 644, 413 F.2d 568 (1969). *See also Newport News Shipbuilding and Dry Dock Co. v. United States*, 7 Cl.Ct. 549 (1985).

[A]ny express or implied contract * * * entered into by an executive agency for—

(1) the procurement of property, other than real property in being;

(2) the procurement of services;

(3) the procurement of construction, alteration, repair or maintenance of real property; or

(4) the disposal of personal property.

This Court has held already that the Contract Disputes Act does not apply to construction-differential subsidy contracts. *Newport News Shipbuilding and Dry Dock Co. v. United States*, 7 Cl.Ct. 549 (1985); *Delta S.S. Lines, Inc. v. United States*, 3 Cl.Ct. 559 (1983). The contracts in issue, while not construction-differential contracts, are very closely related because their *primary* function is to promote the continued modernization of merchant marine vessels. This type of transaction is clearly not the conventional procurement contract envisioned by the drafters of the Contract Disputes Act.

The Contract Disputes Act is an implementation of recommendations made by the Commission on Government Procurement, created by Congress in 1969 to study the procurement process and make recommendations to improve its efficiency. S.Rep. No. 95–1118, 95th Cong., 2d Sess. 1–4 (1978), U.S.Code Cong. & Admin.News 1978, p. 5235. In a 1972 Report, the Commission outlined the steps in the procurement process, noting that it "begins with identification of a need and ends with delivery of goods or services." Report of the Commission on Government Procurement, Vol. 1, at 2 (December 1972). The legislative history of the Merchant Marine Act shows that the "need" of the United States for a reserve of obsolete vessels was only a *minor* factor in the drafting of the trade-in provisions. *See* H.R.Rep. No. 824, 76th Cong., 1st Sess. 6 (1939); S.Rep. No. 724, 76th Cong., 1st Sess. 7 (1939). In fact, the overriding concern of Congress was the modernization of the United States Merchant Marine. To advance this goal, the trade-in provision, while not totally a subsi-dy, is used as a supplement to the construction-differential and operating-differential subsidies also found in the Act. This Court, therefore, believes that the trade-in and use contract at issue is simply too far removed from the conventional procurement contract to fit within the scope of the Contract Disputes Act.

In addition, these contracts were entered into on April 30, 1979, some sixty days after the CDA went into full effect. Yet, the contracts included a disputes clause which clearly did not contemplate coverage by the CDA. The disputes clause uses the language employed when the parties contemplate a Wunderlich Act standard review by a reviewing court.

For all of the foregoing reasons, this Court believes that the CDA is not for application in this case, and, therefore, denies the plaintiff's claim for interest thereunder.

## CONCLUSION

For the reasons discussed herein, the plaintiff's motion for summary judgment is hereby granted, with the plaintiff to recover the sum of $1,146,364.00 in judgment which represents the lay-up contributions plaintiff made to the Government pursuant to the contracts at issue. The plaintiff's motion with regard to interest thereon is denied. The defendant's cross-motion for summary judgment is denied, consistent with this opinion. Costs to the prevailing party. The clerk will enter judgment accordingly.